IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 7, 2006

## STATE OF TENNESSEE v. CASSANDRA ROBINSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-08406     W. Mark Ward, Judge**

---

### No. W2005-01500-CCA-R3-CD  - Filed June 2, 2006

---

The defendant, Cassandra Robinson, was convicted of conspiracy to commit aggravated robbery, aggravated robbery, and aggravated assault. The trial court imposed Range I, concurrent sentences of four years, nine years, and four years, respectively. In this appeal, the defendant asserts that the evidence was insufficient to support her convictions. The judgments of the trial court are affirmed.

**Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which JOSEPH M. TIPTON and NORMA MCGEE OGLE, JJ., joined.

Garland Ergüden (on appeal) and Timothy J. Albers (at trial), Assistant Public Defenders, for the appellant, Cassandra Robinson.

Paul G. Summers, Attorney General & Reporter; Brian Clay Johnson, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stephanie Johnson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

At 9:00 p.m. on July 10, 2003, two African-American men, one of whom was armed with a long-barreled handgun, entered a McDonald's Restaurant in Memphis and required the employees to open the cash registers and the safe. After taking cash, coins, and gift certificates, the two men fled the scene. Arlisha Walton, the manager on duty, described the armed robber as having a red complexion and the other as having a dark complexion. She recalled that the man with the red complexion jumped on top of the counter and ordered the employees to the floor. According to Ms. Walton, who had opened the safe, the armed robber re-entered the store in an effort to take the videotape from the security camera. When she informed him that she did not have access to the videotape, he again fled the restaurant. Later, Ms. Walton was able to identify the dark complected man from a photographic line-up, but she had no knowledge of whether the defendant had any participation in the robbery.

Jessica King, also a McDonald's employee, was working the drive-through window when a "red dude" suddenly appeared, pointed a gun at her, and demanded that she open her register. After he took the money in her drawer, he went into the manager's office before running from the store and entering a white truck. According to Ms. King, the defendant had followed the "red dude" into the parking lot, parked her separate car, and then got into the white truck where she stayed for about fifteen minutes before the robbery took place. Ms. King recalled that the white truck was parked in the lane next to the drive-through lane, blocking two other vehicles.

Michael Heard, the manager of the previous shift at the restaurant, also saw the defendant drive into the parking lot. Heard's girlfriend and children were waiting for him in his car in the lot when a truck he identified as a silver Dodge Ram entered the lot, temporarily blocking not only his car but that of the defendant. As he started to leave in his car, Heard noticed two men on the employee-side of the counter and then saw them accompany Ms. Walton into the office. As the two men left the restaurant, a man pointed a gun at him and ordered him to get away from the door. As Heard searched for a police officer, he saw the silver truck at a traffic light, flagged down an officer, and informed the officer that the truck had been involved in a robbery. According to Heard, the windows of the truck had a reflective tint, preventing him from seeing inside. He never saw the defendant talk to anyone in the truck prior to the robbery.

Sherline Felix, Heard's girlfriend, saw the defendant park two spaces from her about three or four minutes before the Dodge Ram truck arrived at the restaurant. She remembered that the defendant got out of her car and entered the truck, which was occupied by a man in the driver's seat. She recalled seeing more than one man near the driver's side of the truck and saw a total of three men enter the McDonald's, one of whom walked through one door and out another door on the opposite side of the restaurant. According to Ms. Felix, the truck "sped off" when the robbers entered the restaurant. When she noticed a man "jump the counter," she tried to call the police on her cell phone but got no signal. She confirmed that one of the robbers pointed a gun at her and her boyfriend as he left the restaurant. Ms. Felix was also unable to see inside the truck because of the tint on the windows and was unaware of whether the driver of the truck was one of the two men she saw rob the McDonald's.

Memphis Police Department Sergeant Marlin Tabor, who interviewed the defendant the day after her arrest, learned that the defendant claimed to have met a man named "Larry" at the McDonald's on the night of the robbery. According to the officer, the defendant claimed that when she entered "Larry's" truck, two African-American men, who had just left the McDonald's, also got inside. Sergeant Tabor stated that the defendant told him that the two men admitted robbing the restaurant and that they divided the money before dropping her off. In her statement to the officer, the defendant claimed to have known "Larry" for only about two hours prior to the robbery. She described his truck as a silver or white Dodge Ram with tinted windows, capable of seating four people. She denied any prior knowledge of the robbery but was aware that the cash, coins, and light pink and light green envelopes had been stolen from the restaurant. When taken by the defendant to "Larry's" apartment, the location where she claimed the money from the robbery was divided, Sergeant Tabor questioned the individual who lived there but lodged no charges.

Memphis Police Officer Brad Newsom, who assisted in the investigation, described the defendant as "very anxious to talk" about her role in the incident. In a second statement, the defendant admitted to him that she participated in the robbery with "Kevin," "John," and "Larry." The officer determined that "John" was actually Anthony Edwards and that "Kevin" was a Justin or Jason Brewer.[1] According to the officer, when the defendant was asked whose idea it was to rob the restaurant, she answered, "I talked on it so I talked to Kevin and John about it." She claimed to the officer that a black .32 caliber handgun was used in the robbery and that their vehicle was a white Dodge truck with an extended cab. The defendant provided descriptions of "Kevin," "John," and "Larry" and identified "Kevin" and "John" in photographic line-ups. In her statement, the defendant recalled that she and "Larry" met "John" and "Kevin" in a Wal-Mart parking lot at approximately 8:15 p.m. and then drove to McDonald's, where she got into "Larry's" truck as "John," wearing a bandana over his face, and "Kevin" went into the McDonald's. She stated that "John" and "Kevin" returned to the truck and, after riding with the defendant and "Larry" to the Wal-Mart, left in a separate car. The defendant informed the officer that she and "Larry" returned to McDonald's and discovered that her car was being towed away. She recalled that she was then dropped off at an apartment complex and never received her share of the robbery proceeds. When asked why she participated in the robbery, the defendant stated as follows:

> I was upset because of my pay. I was supposed to be making $7 an hour, and she only paid me $6.75, an hour. I was supposed to be making that much because I had [taken] the manager test, . . . but . . . the store manager[] did not want to give it to me.
> I was in a financial bind because I was not making enough money. I had to pay child support for my three kids, and that was coming out of my check. We had talked about it, and she never told me that I was not going to get it. I went to her and asked her about it, and she told me I wasn't going to get it.

Sergeant Shirley Woods, the lead investigator in this case, transported the defendant from jail to the police station for an interview. During that time, the defendant claimed that she could not remember the name of the apartment complex where she and others went after the robbery but could show Sergeant Woods where it was located. Upon their arrival at the apartments, the defendant directed Sergeant Woods to a unit occupied by a man named Eric Isom. Isom was taken to the police station for questioning but was released without being charged with any crime. Mr. Isom's cousin, Darron Savage, who was in Birmingham, Alabama, returned to Memphis for an interview when the defendant identified him as "Larry," the driver of the Dodge truck. He was also released without being charged in the robbery. According to Sergeant Woods, the defendant was "anxious to talk" about the robbery and at no point received any leading information from the police about the details. Sergeant Woods was aware that Sergeant Tabor and another officer had previously interviewed the defendant. She explained that she conducted a separate interview only because that particular McDonald's Restaurant had been robbed twice in one week. The officer recalled that when she confronted the defendant with some evidence that contradicted her statement, the defendant became

---

[1] As the result of the investigation, it was determined that "Larry" was Darron Savage.

upset and began to implicate "John" and "Kevin" in the robbery. According to the sergeant, the defendant explained that although she was working as a manager at the McDonald's, she was not being paid at that level and admitted meeting with "John" and "Kevin" to discuss robbing the restaurant.

On cross-examination at trial, Sergeant Woods acknowledged that none of the information the defendant provided during the initial ride from the jail to the police station proved to be accurate. She testified that the people she identified as "Larry," "John," and "Kevin" were really Darron Savage, Anthony Edwards, and Justin Brewer, respectively. She confirmed that the driver, Savage, corroborated portions of the defendant's story and cited as an example her claim that he was with the defendant in his truck at the time of the robbery. According to the sergeant, no other witness described either of the robbers as having worn a bandana or any type of disguise. She recalled that the defendant did not describe either of the men as having a "red" complexion.

Darron Savage, whom the defendant had identified as "Larry," testified as a defense witness at the trial. He claimed that he met the defendant on the day of the robbery, that he arranged to meet her at the McDonald's, and that when she arrived, he drove her away in his truck. He described his truck as a white and gray Dodge Ram with tinted windows and he claimed that no one else was in his truck. Savage denied any involvement in the robbery and contended that the defendant was with him for at least a couple of hours. He denied discussing the robbery and denied that there were robbery proceeds taken to his cousin's apartment. He also claimed that he did not receive any money from a robbery. Savage recalled that he and the defendant did consume alcohol together and that she later performed oral sex for twenty dollars. He testified that they returned to McDonald's, saw the police in the lot, and then saw her car being towed. According to Savage, the defendant informed him that her car was being repossessed and he then dropped her off at an apartment complex. Savage, who spent seventy-two hours in jail while being investigated for the robbery, believed that the defendant had something to do with the robbery because she had lied to the police about his involvement. He stated that there was "something spooky about that night." Savage inferred that the McDonald's may have already been robbed by the time he arrived at the restaurant on the first occasion because there were a lot of people outside.

The defendant claimed that she met Savage on the day of the robbery, seeing him at a traffic light and exchanging telephone numbers. She testified that she parked in the McDonald's parking lot and that Savage drove her to his cousin's house where they drank alcohol for an hour or two. She stated that they drove to a park, where she performed oral sex on him, before returning to the McDonald's. According to the defendant, they saw that her car was being towed and then proceeded to an apartment complex, where she got out of the truck. She claimed a man named Bolden then drove her to her residence, where she was arrested. The defendant contended that before she gave the taped statement, she told the officers three or four times that she was not involved in the robbery. She testified that "John" and "Kevin" were not real people, and that she "just made . . . up" what she told the police. She claimed that she lied when she informed them that four men were involved in the robbery and that different colored envelopes were taken during the robbery. She explained that she was scared, wanted to go home, and thought that if she just made up a story, they would release

-4-

her: "[W]hen I made up the tale to tell them, that's when they really seem[ed] like they were listening when I started just making up stuff, telling them. That's when they seem[ed] like they really were listening to me."

The defendant further testified that in her statement to Sergeant Woods, she confessed to participating in the robbery only because the sergeant had promised to let her go home if she admitted her involvement. She claimed that Sergeant Woods had said, "You got to make it look good before we can really just actually let you go home so you got to say you was involved . . . so we can let you go." She explained that Sergeant Newsom "threw a napkin and nodded at me and said, like, pick him, you know" when she saw "John" in the photographic line-up. The defendant contended that Sergeant Woods suggested that she admit that a black .32 caliber handgun was used in the robbery and that money was taken during the robbery. She admitted to saying that Savage's truck was the one used in the robbery but insisted that he was not actually involved in the crime. She also claimed that she lied, at Sergeant Woods' direction, when she described "John" as wearing a bandana over his face during the robbery. She contended that any admissions she made as implicating her in the robbery were false. She basically insisted that because the officers were not listening to her, she "just made up something to tell them. I just told them what they wanted to hear." The defendant, for the most part, attributed to Sergeant Woods the information she had provided in her statement.

In this appeal, the defendant asserts that the evidence was insufficient to support the convictions for conspiracy to commit aggravated robbery, aggravated robbery, and aggravated assault. She contends that because her convictions are based "primarily" upon her confession to police and because the remainder of the evidence was "quite inconsistent," the evidence was insufficient to support the convictions.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

The inchoate offense of conspiracy is defined in Tennessee Code Annotated section 39-12-103 as follows:

(a) The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.

Tenn. Code Ann. § 39-12-103(a) (2003).

To obtain a conviction for aggravated robbery, the state must prove that the defendant committed a robbery "with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-402(a)(1) (2003). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2003). One commits an aggravated assault by intentionally or knowingly causing another reasonable fear of imminent bodily injury by the use or display of a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(B) (2003).

The defendant was convicted of aggravated robbery and aggravated assault under a theory of criminal responsibility. In State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994), this court held that the statute attaching criminal liability for the conduct of another requires the culpable mental state of intent. Knowing, reckless, and negligent mental states are insufficient. Id. For the evidence to be sufficient to sustain a conviction under the criminal responsibility for the conduct of another statute, there must be proof that the defendant intended, as defined in Tennessee Code Annotated section 39-11-302(a), to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense. Tenn. Code Ann. § 39-11-402(2). In addition, there must be proof that the defendant solicited, directed, aided, or attempted to aid another to commit the offense. Id.

In our view, the defendant's confession established all of the elements of the offenses. A defendant, however, cannot be convicted solely upon the evidence of his inculpatory statement. See Ashby v. State, 139 S.W. 872, 875 (1911). Under our law, the "corpus delicti [of the crime] cannot be established by a confession alone." Taylor v. State, 479 S.W.2d 659, 662 (Tenn. Crim. App. 1982). A confession may sustain a conviction when "there is other evidence to show the commission of the crime by someone." State v. Stapleton, 638 S.W.2d 850, 854 (Tenn. Crim. App. 1982). The slightest corroborating evidence of the confession is sufficient, however. See State v. Ervin, 731 S.W.2d 70, 72 (Tenn. Crim. App. 1986). Furthermore, while a confession may be corroborated by independent proof, the corroborating evidence need not connect the defendant with the crime. Buckingham v. State, 540 S.W.2d 660, 663 (Tenn. Crim. App. 1976). Similarly, the corroborating evidence necessary to support the corpus delicti need not be sufficient, in and of itself, to support the conviction, but need only provide "the essential facts . . . to justify a jury inference of their truth." Opper v. United States, 348 U.S. 84, 93 (1954).

Here, the defendant told police that she planned the robbery with "John" and "Kevin," met them and "Larry" at a nearby Wal-Mart, and drove to the McDonald's. She stated that on the night of the robbery, she was in "Larry's" white Dodge truck when "John" and "Kevin" got out of the truck, went into the restaurant, and committed the robbery. She admitted that she was to receive some of the robbery proceeds and explained that her participation in the robbery was motivated by her displeasure with her hourly wage. There is direct evidence to support the defendant's confession. Ms. Walton testified that two men entered the restaurant around 9:00 p.m. and took money from the cash registers and safe. She identified "John" from a photographic line-up as the man who jumped onto the front counter and ordered her to the floor. The man she identified was the same man that the defendant identified as "John" from a separate photographic line-up. Ms. King saw the defendant enter into the parking lot just before the driver of the white truck did and then saw the defendant get into the truck. According to Ms. King, the man who pointed a gun at her and took money from her register returned to the white truck occupied by the defendant. Ms. Felix observed a woman get into a Dodge truck, saw three men enter the McDonald's, and recalled that one man jumped on the counter.

In our view, this corroboration of the confession is sufficient to sustain convictions for conspiracy to commit aggravated robbery, aggravated robbery, and aggravated assault. It is also our view that the evidence, independent of the defendant's confession, was sufficient to support the convictions. With regard to the conspiracy charge, this court has previously noted that an "unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise." Randolph v. State, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978); see State v. Carter, 121 S.W.3d 579, 589-90 (Tenn. 2003). The verdict resolved the conflicts in the testimony in favor of the state. See State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995).

Accordingly, the judgments of the trial court are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE