IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 6, 2007 Session

## STATE OF TENNESSEE v. PHILLIP BLACKBURN

Appeal from the Criminal Court for Shelby County
No. 05-08304     Lee V. Coffee, Judge

No. W2007-00061-CCA-R3-CD  - Filed June 10, 2008

The defendant, Phillip Blackburn, was convicted of one count of aggravated robbery and one count of attempted aggravated robbery.  The trial court imposed an effective sentence of ten years.  In this appeal, the defendant contends that the trial court should have suppressed the pretrial identifications of the defendant as unduly suggestive, raises numerous challenges to the handling of the testimony of co-defendant Danny Green, asserts that he should have been permitted to impeach the testimony of one of the victims by the use of a prior conviction, insists that the evidence was insufficient, in light of the "numerous" errors at trial, to support the convictions, and complains that the trial court erred in the assignment of weight to the established enhancement and mitigating factors.  Because the trial court should have granted the defendant's request for a mistrial, the judgments of the trial court are reversed and the case is remanded for a new trial.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Reversed and Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ., joined.

Andre Wharton, Memphis, Tennessee, for the appellant, Phillip Blackburn.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and David Pritchard, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The convictions in this case arose during the robbery of a Backyard Burgers Restaurant in Memphis, Tennessee.  At approximately 9 a.m. on May 5, 2005, two masked men entered the restaurant behind employee LaQuintin McKinney, trained a gun on employee Priscilla Allen, and ordered her to open the restaurant safe.  A second gunman kept watch over employee Kamela Ward during the robbery.

Ms. Allen testified that she was running late and had not yet been to the bank to deposit the previous night's money when the robbery occurred. As she entered the office to prepare the deposit, she saw Mr. McKinney exit the restaurant to take out the trash. Moments later, she heard Ms. Ward scream, and when she stepped outside the office, "the gentleman had a gun and he told me to back up." The gunman, who was wearing glasses, grabbed her by the neck, put a gun to her head, and forced her into the office. The gunman, who she identified as the defendant, and a second man, who she identified as co-defendant Danny Green, told her "to open up the safe and . . . give them all of the money from out of the safe and . . . get it right the first time." The defendant took $1300 from the safe while Mr. Green subdued the other employees in the kitchen area of the restaurant. After taking the money, the defendant forced Ms. Allen into the kitchen area, and the robbers demanded that the victims give up their money and identification. When the victims stated they had no money or identification, the two men left the restaurant, and Ms. Allen telephoned 9-1-1.

During cross-examination, Ms. Allen acknowledged telling police that the gunman resembled former Backyard Burgers employee Terrance Florence, whom she described as "Thin, like [the defendant]. Tall, like [the defendant]. Thin and little bitty eyes, just like [the defendant]." Ms. Allen recalled that police informed her that Mr. Florence had not committed the offense.

Kamela Ward had arrived a 9:00 a.m. on the morning of May 5, 2005, to begin her daily duties as a cashier at the Backyard Burgers. Sometime after her arrival but before the store was scheduled to open at 10:00 a.m., Mr. McKinney "went out to take the garbage out and . . . he had knocked on the door for me to let him back in." Because of her small stature, Ms. Ward saw only Mr. McKinney standing at the door and opened it. She described what happened after she opened the door:

> [W]hen I opened the door to let him in, him and two more other guys came in behind him. And one had a gun and one didn't have a gun. . . . One was light skinned, tall [and] skinny . . . . Had on some glasses. . . . The dark skinned one had a gun. . . . [T]hey tailed LaQuintin on to the back where Priscilla was.

After returning from the back of the restaurant, the perpetrators demanded that the victims hand over their identification and purses. Ms. Ward explained that she had neither on her person, and the two men left the restaurant. Ms. Allen called 9-1-1 on her cellular telephone while Ms. Ward called the police from the Backyard Burgers telephone. Ms. Ward testified that although she had identified the defendant as one of the perpetrators from a photographic lineup, she was unsure of her identification and could not state with certainty at trial that the defendant had committed the offenses.

Kathy Holmes, who was charged with facilitation of aggravated robbery for her role in the offenses, testified on behalf of the State that the defendant, who was a friend of her boyfriend, asked if she would act as a getaway driver for a robbery he planned to commit. The defendant promised to help Ms. Holmes post bond for her boyfriend, who had been incarcerated for some time. Ms. Holmes stated that she initially refused to participate in the robbery, but on the morning of the offense, the defendant met her on the steps of her apartment building and forced her into the car,

where Mr. Green was waiting. The defendant brandished a silver handgun and told Ms. Holmes that she would "regret it" if she refused to participate. Ms. Holmes agreed to act as the driver, explaining that she was scared because "[h]e knew where I lived. He knew where all my children lived and I was pregnant at the time." According to Ms. Holmes, the defendant kept the silver handgun on his lap during the drive to the Backyard Burgers and made several telephone calls to "LaQuintin." "When we got to the Backyard Burgers, there was an associate bringing in the garbage and they told me to stop and that's when they jumped out of the car and ran in behind the associate." Ms. Holmes said she rolled up the windows and started to drive away after hearing screams from inside the restaurant. Before she could get away, the defendant and Mr. Green ran from the restaurant toward the car. Ms. Holmes testified that the defendant pointed the gun at her and told her "to open the door, or he would kill me, that we had to go, go, go." The two men dropped her off and promised to "get back with" her. Ms. Holmes stated that she received none of the proceeds from the robbery. She recalled that at the time of the robbery, the defendant wore glasses and had "dreads, probably down to his shoulders . . . and also he had a goatee."

During cross-examination, Ms. Holmes admitted that she had initially stated that she participated in the robbery to raise money for her boyfriend's bail. She insisted, however, that the initial statement was false and given only because she feared the defendant. Ms. Holmes testified that her fear of the defendant also kept her from contacting police after the robbery. Ms. Holmes acknowledged that she expected to enter a guilty plea and hoped to receive a diversionary sentence.

The defendant presented no proof.

At the conclusion of the trial, the jury convicted the defendant as charged. After a sentencing hearing, the trial court imposed an effective sentence of ten years.

*I. Suppression of Pretrial Identifications*

The defendant contends that the trial court erred by denying his pretrial motion to suppress the pretrial identifications of the defendant made by Ms. Allen and Ms. Ward. He asserts that the identification procedures were unduly suggestive, rendering later in-court identifications unreliable and inadmissible. The State contends that the identification procedures were not unduly suggestive and that nothing in the evidence suggests that the identifications were unreliable or inadmissible.

"Convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968). In *Simmons*, the Court observed that "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals." *Id.* at 383. Noting that "[e]ven if the police subsequently follow the most correct photographic identification procedures . . . , there is some danger that the witness may make an incorrect identification," the Court concluded that the danger of misidentification "will be increased if the police display to the witness only the picture of

a single individual who generally resembles the person he saw, or if . . . the photograph of a single such individual recurs or is in some way emphasized." *Id.* The Court also observed that "[t]he chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Id.*

Following *Simmons*, the Court in *Neil v. Biggers*, 409 U.S. 188, 198-99, 93 S. Ct. 375, 381-82 (1972), established a two-part analysis to assess the validity of a pre-trial identification. First, the trial court must determine whether the identification procedure was unduly suggestive. *Id.* at 198, 93 S. Ct. at 381-82. Next, if the trial court determines that the identification was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. *Id.* at 198-99, 93 S. Ct. at 382.

The trial court denied the defendant's pretrial motion to suppress the eyewitness identifications, concluding that the defendant had failed to establish that the identification procedure used with each witness was impermissibly suggestive. When the trial court makes a finding of facts at the conclusion of a suppression hearing, the facts are accorded the weight of a jury verdict. *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn. 1994). The trial court's findings are binding upon this court unless the evidence in the record preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *see also Stephenson*, 878 S.W.2d at 544; *State v. Goforth*, 678 S.W.2d 477, 479 (Tenn. Crim. App. 1984). Questions of credibility of witnesses, the weight and value of the evidence, and resolution of conflicts in evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence. *Odom*, 928 S.W.2d at 23. We review the defendant's claim with these standards in mind.

At the hearing on the motion to suppress, Memphis Police Department Sargent Walter Davidson testified that the defendant, Mr. Green, and Ms. Holmes became suspects after an anonymous individual reported to CrimeStoppers that they were involved in the robbery. After the tip was received, two photographic lineups, one containing a photograph of the defendant and a second containing a photograph of Mr. Green, were prepared by entering into a computer "the . . . similar age, age range, race," and physical characteristics of each defendant. Sargent Davidson explained, "[W]e go by complexions and things such as that to make sure that . . . no one stands out, and that they are all similar and like in appearance." Sargent Davidson also testified that the suspects were randomly positioned on the array by the computer.

Sargent Davidson showed the photo spreads to Ms. Allen on June 9, 2005. He testified that he did not tell Ms. Allen whether either lineup contained a suspect. He also denied suggesting that she pick a certain photograph or making any one photograph more obvious than the others. After viewing the lineups for a short time, Ms. Allen circled the defendant's picture and signed her name.

Ms. Allen confirmed Sargent Davidson's testimony regarding the identification procedure. She testified that Sargent Davidson told her that two suspects had been arrested but did not tell her that either suspect's photograph was in the array. She repeatedly insisted that no one suggested in any way that she choose a specific photograph. She also stated that none of the photographs was highlighted.

Memphis Police Department Officer Joseph Poindexter showed the photographic lineups to Ms. Ward on June 9, 2005. Officer Poindexter testified that he did not suggest that Ms. Ward choose the defendant's photograph and did nothing to draw attention to that photograph. He stated that he told Ms. Ward that he had a suspect who might not be featured in the lineup. Officer Poindexter testified that Ms. Ward indicated that she was positive in her identification of the defendant.

Ms. Ward testified that she "wasn't to[o] sure about" her identification of the defendant because the robbery "happened so fast." She said that she identified the defendant using a process of elimination and that although the defendant resembled the first perpetrator to enter the restaurant, she was not positive. Ms. Ward emphasized that Officer Poindexter did not tell her to choose the defendant's photograph and, in fact, did nothing to suggest that she pick any certain photograph. During cross-examination, she reiterated that she chose the defendant's photograph because the defendant looked familiar.

Regarding the photographic lineup, the trial court observed that "[i]t appears . . . to be a fair composition of six individuals with similar features and hairstyles. There's nothing outstanding or unique about [the defendant] in the photograph . . . ." The trial court concluded that "it appears to the Court from all the testimony . . . that there was no violation of [the defendant's] rights." We agree.

Neither victim described any behavior on the part of the police officers that was designed to suggest the selection of the defendant's photograph. Although both Sergent Davidson and Officer Poindexter informed the witnesses that a suspect had been arrested, neither stated that the suspect's photograph appeared in the lineup. The photographic array, which appears in the appellate record, does not appear to be suggestive on its face. The defendant's photograph is not highlighted in any way and the appearance of the others in the array is similar to that of the defendant. Further, the defendant's photograph appears only a single time in the lineup. Although Ms. Ward later testified at the hearing on the motion to suppress and at trial that she was uncertain of her identification, she indicated on the identification form that she was certain. Her uncertainty would not, in any event, lead to a conclusion that the identification procedure was unduly suggestive. Because the defendant has failed to establish that the procedure used to procure the pretrial identification was not unduly suggestive, we need not discuss further the factors outlined in *Neil*. The judgment of the trial court denying the motion to suppress the identifications is affirmed.

## II. Cross-examination of Priscilla Allen

The defendant next asserts that he should have been permitted to utilize Ms. Allen's previous conviction for theft during his cross-examination of the witness. The State contends that, because the conviction was 13 years old, the trial court properly ruled that it could not be used to impeach the witness pursuant to Tennessee Rule of Evidence 609.

Tennessee Rule of Evidence 609 provides in pertinent part:

(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:

(1) The witness must be asked about the conviction on cross-examination. If the witness denies having been convicted, the conviction may be established by public record. If the witness denies being the person named in the public record, identity may be established by other evidence.

(2) The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement.

. . . .

(b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution; if the witness was not confined, the ten-year period is measured from the date of conviction rather than release. Evidence of a conviction not qualifying under the preceding sentence is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect.

Tenn. R. Evid. 609. We review the trial court's determination of this issue via an abuse of discretion standard. *State v. Thompson*, 36 S.W.3d 102, 109 (Tenn. Crim. App. 2000).

Here, the defendant sought to cross-examine Ms. Allen with a 13-year-old conviction for theft, arguing that the conviction was relevant to the witness's veracity. The trial court sustained the State's objection, ruling that the conviction lacked any probative value because of its staleness. Although the trial court did not express any reasons for not applying the exception to Rule 609(b)'s time limit for prior convictions, we nevertheless reject the defendant's bid to place the trial court in error. As the proponent of the use of a 13-year-old conviction to impeach a prosecution witness, the defendant was obliged to "give the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence." Tenn. R. Evid. 609(b). The record contains no indication of any such notice. More importantly, the defendant did not proffer any evidence that would show that the probative value of the dated conviction, albeit a theft conviction, substantially outweighed its prejudicial effect. *See id.; see also* Tenn. R. Evid. 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context."). Thus, based upon the present record,[1] we discern no error in the trial court's refusal to allow the witness to be impeached with a 13-year-old conviction.

### III. Testimony of Danny Green

The defendant mounts four separate but interrelated challenges to the trial court's handling of the testimony of Danny Green, who was a co-defendant of the defendant but not on trial jointly with him. Each claim has some measure of merit and, due to the related nature of the claims and our view that the trial court erred by denying the defendant's request for a mistrial, we will consider each of the defendant's claims as it relates to the defendant's assertion that the trial court should have granted a mistrial.

The series of events leading to the defendant's motion for a mistrial began with the State's calling co-defendant Danny Green as a witness. After Mr. Green was seated on the witness stand, the trial court inquired on the record and in the presence of the jury whether the witness had agreed to waive his Fifth Amendment protection against self-incrimination. The trial court explained to the witness and the jury that the witness had been indicted jointly with the defendant and had not yet been tried. After an extensive voir dire, the trial court concluded that Mr. Green had voluntarily, intelligently, and knowingly agreed to waive Fifth Amendment protection. Mr. Green immediately implicated himself and the defendant in the robbery of the Backyard Burgers. He testified that the defendant approached him about participating in the robbery and that he agreed to take part. He stated that he and the defendant went to Mr. McKinney's house to the discuss the robbery. The following colloquy then commenced:

> [Prosecutor]: So you're supposed to meet up with [Mr. McKinney]; did that happen?

---

[1]If the issue comes up on retrial, the defendant will have opportunity to seek the trial court's further evaluation of this impeachment issue.

[Mr. Green]:  Yes, sir.

[Prosecutor]:  Tell us about that?

[Mr. Green]:  We met up at his house.  I picked up [the defendant] at a gas station and we met at his house.

[Prosecutor]:   Just the three of you, or was there anyone else involved?

[Mr. Green]:  It was Ms. Holmes, [Ms. Allen] and [Ms. Ward] and [Mr. McKinney].

[Prosecutor]:  What are you talking about now?

[Mr. Green]:  That we met up at his house to talk about what was going to happen in the robbery.

[Prosecutor]:  Tell us about that?

[Mr. Green]:  Well, basically we went to [Mr. McKinney's] house and we met up with everybody else and they was telling us how the robbery was going to take place and that we was the only chosen two that can follow through with the robbery.

[Prosecutor]:  Okay.  Who was the chosen two?

[Mr. Green]:  Me and [the defendant], they ask us if, you know, we was willing to do the robbery, you know, and we said, yeah.

[Prosecutor]:  Who is, "they"?

[Mr. Green]:   Me and [Mr. McKinney] and [Ms. Allen] and [Ms. Ward].

[Prosecutor]:  You're saying that [Ms. Allen] and [Ms. Ward] were at this meeting?

[Mr. Green]:  Yes, sir.

[Prosecutor]:  When did this meeting take place?

[Mr. Green]:  May the 3rd.  It was about a couple of days before the robbery happened.

At that point, the prosecutor approached the bench and requested a jury-out hearing, explaining, "It's my belief that this is perjury testimony and I'll need to consult with his lawyer for a moment, because I can't put on what I believe to be knowingly perjury testimony." The trial court granted the request for a recess, during which the defense objected, stating that the proper procedure would be for the prosecutor to voir dire the witness regarding the questionable testimony outside the presence of the jury. Defense counsel objected to the prosecutor's discussing Mr. Green's testimony with Mr. Green and his attorney in the middle of the witness's direct examination. The trial court overruled the objection, stating that it would allow Mr. Green to discuss the situation with his attorney. Defense counsel objected further, noting that Mr. Green did not ask to speak to his attorney and that instead "it was [the prosecutor] who wanted a recess so that in my opinion . . . this man could be under some undue influence by his lawyer, or to try to get his testimony together." The trial court stated that it would not allow defense counsel to "attack the integrity" of the prosecutor and overruled the objection. The trial court explained that "the prosecutor cannot go forward with this witness if he believes that this witness is committing perjury. That is absolutely the law and it is absolutely his ethical obligation." The trial court ruled that it had properly allowed the prosecutor to speak with Mr. Green's attorney and had also appropriately allowed the attorney to speak with his client.

After Mr. Green and his attorney left the courtroom, defense counsel lodged another objection to the proceedings:

> Now, there is a very simple recourse for [the prosecutor], or any lawyer who stands in a place where a witness is testifying to something that was not consistent to what they said. And the recourse is, you just get them off the stand. It's just that simple.
>
> This man does not have to be his witness. He called the witness and it would seem to me that that witness, at that point, when he becomes, or is observed to be testifying to something that is not consistent and you believe it may be perjury, then it seems to me that the lawyer for the state, or whoever has called that witness, has to make a choice about the witness.
>
> Now, the question is, what's perjury, I would submit is a matter for then the jury, to be perfectly honest. . . .
>
> We're seeing the facts come from the evidence on the witness stand. And yet, the minute that this witness says something that is a little shocking to [the prosecutor], we automatically assume it's perjury.
>
> We don't know if it was perjury . . . those matters that he told [the prosecutor], that might have been inconsistent. Then he has a hostile witness. There are ways to deal with that.

The court defended its ruling, and the prosecutor indicated that "[t]he matter's been resolved." The prosecutor explained that he had elected to cease questioning the witness and would "pass the witness in front of the jury." The trial court then asked Mr. Green's attorney whether his client wished "to continue to waive his [F]ifth [A]mendment right to self-incrimination." The court then conducted a voir dire of the witness:

> [Court]: Mr. Copeland has now indicated that you have changed your mind, which is of your absolute right. At any time you decided that you want to not testify, if you want to stop giving statements you have an absolute right to re-invoke, or to invoke that [F]ifth [A]mendment privileges.
>
> Is it your intention at this time that you no longer wish to testify in this trial?
>
> [Mr. Green]: Yes, sir.
>
> [Court]: Do you no longer wish to be questioned by anyone regarding your involvement, or your knowledge of this offense?
>
> [Mr. Green]: No, sir.

The prosecutor then stated his intention to call Mr. Green's attorney, Mr. Copeland, as a witness to rebut his client's statement that Ms. Ward and Ms. Allen were involved in the planning of the robbery. Defense counsel objected to both the reassertion of Mr. Green's privilege against self-incrimination and the State's plan to call Mr. Copeland as a witness. Defense counsel stated that the trial court's handling of Mr. Green's testimony had caused the defense to be "hamstrung." The trial court overruled the objection to its ruling that Mr. Green could reassert his Fifth Amendment rights explaining, "If a right is waived, it is not waived permanently." The court likened the situation to that of an accused during a custodial interrogation, "if this defendant waived his right . . . and in the middle of giving a statement . . . told the police officer, I want to talk to a lawyer, I want to stop this questioning, right now," all questioning would have to cease.

Defense counsel noted for the record that Mr. Green had not himself asked to stop the questioning so that he could speak with his attorney. Instead, it was the prosecutor who stopped the questioning and the prosecutor who asked that the witness consult with his lawyer. The trial court nevertheless overruled the objection. The court then asked the prosecutor why he desired the testimony of Mr. Green's attorney. The prosecutor responded, "I would call Mr. Copeland for the purposes of saying that this conversation regarding a prior meeting between all of the parties involved, including Priscilla Allen and Kamela Ward was never brought up by Mr. Green." The defendant objected, noting that "this is a case that is going far beyond . . . the mandates of the Constitution. . . . [T]his is the most preposterous thing I've ever heard of in my life." Defense counsel continued, "[The defendant] is not getting a fair trial, in my opinion, . . . with all due respect,

but we have a comedy of all of these errors." The trial court agreed that it would be inappropriate to allow Mr. Copeland to testify to statements made by his client.

The trial court then ruled that it would require Mr. Green to invoke his Fifth Amendment right in front of the jury. The court also concluded that because it would not be fair for the defendant "to be denied an opportunity to effectively cross-examine this . . . witness," "the only remedy that the [c]ourt would have at that point, would be [to] order that Mr. Green's testimony be stricken from the record and I would inform the jury not to consider any of his testimony for any purposes." The defendant objected, "That's exculpatory testimony. . . . That came out before you re-invoked the [F]ifth [A]mendment. He freely and voluntarily, you know, chose to testify . . . . [W]e submit [that] should be allowed to be considered by this jury . . . ." The court overruled the objection:

> It would be unfair to both sides in this situation to allow that testimony to stand on the record when you . . . would not be given an opportunity to cross-examine that testimony and [the prosecutor] would not be given an opportunity to develop that testimony and to impeach Mr. Green with any previous statements that he may have given . . . .
>
> . . . .
>
> The only other remedy that I would have at that point would be to allow [the prosecutor] to call Mr. Copeland and have Mr. Copeland testify about those statements that may have been given, because those would be prior inconsistent statements. It would not violate any attorney client privileges, because the statements were made in the presence of a third party.

The trial court then suddenly indicated that it had reconsidered its earlier ruling and had decided that "Mr. Green does not have a right to re-invoke his [F]ifth [A]mendment privileges once he's waived those rights." Nevertheless, the trial court concluded that it could not "compel [Mr. Green] to provide any answers" and that if the witness indicated an unwillingness to answer further questions it "would tell the jury at that point that all of his testimony shall be stricken."

The defendant again objected to the striking of Mr. Green's testimony. Defense counsel reiterated the opinion that the proceedings had become "grossly, grossly unfair and in my opinion, a violation of [the defendant's] fundamental due process right to a fair trial" and asked for a mistrial. The court denied the request and explained, "I am not necessarily going to strike that testimony, but it would be patently unfair not to allow the State of Tennessee to impeach that testimony." The court again stated that Mr. Green "cannot take back his [F]ifth [A]mendment privileges against self-incrimination. But, I cannot compel him to answer questions." The court then brought Mr. Green back in and questioned him in front of the jury. During that colloquy, the court advised the witness, "[I]f he decides to ask you a question . . . you don't have the right to say, I'm taking my [F]ifth [A]mendment privileges against self-incrimination, I don't want to testify. But,

-11-

you do have the right to say that I choose not to answer[.]" When the trial court asked the witness if he desired to waive his attorney-client privilege with regard to those statements made in the presence of his attorney and the prosecutor, Mr. Green's attorney interjected and asked for a continuance so that he could consult the Board of Professional Responsibility. Mr. Copeland also stated that it was his opinion that his client had not committed perjury because he had never been asked if Ms. Allen and Ms. Ward participated in the planning of the robbery.

The trial court then ruled that it would strike Mr. Green's testimony on the basis of his refusal to answer any further questions. Defense counsel again objected to the striking of the testimony. In the alternative, the defendant again asked the trial court to declare a mistrial. The trial court overruled the objection, denied the request for a mistrial, and instructed the jury to disregard Mr. Green's testimony. Neither the State nor the defendant put on any further proof.

As indicated, the defendant presents several claims with regard to the trial court's handling of Mr. Green's testimony and contends that the trial court should have granted a mistrial. Whether to grant a mistrial is an issue entrusted to the sound discretion of the trial court. *See State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). The burden of establishing the necessity for mistrial lies with the party seeking it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *Id*. On appeal, this court will disturb a trial court's denial of a motion for mistrial only when there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990); *Williams*, 929 S.W.2d at 388. An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). We will consider each of the trial court's rulings in turn.

Upon being surprised by Mr. Green's revelation that the victims had actually been involved in the planning of the robbery, the State ceased questioning and approached the trial court. We must interject here that the effect of this testimony was to paint the victims, both of the State's eyewitnesses, as accomplices. We also note that a defendant may not be convicted by uncorroborated accomplice testimony. *See State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2000) (citing *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)). The prosecutor then expressed concern to the judge that the witness was offering perjured testimony. The State's later proffer regarding its perjury concern, however, demonstrated that it had no good faith basis to advance the perjury claim. The prosecutor stated that Mr. Green had never before indicated that Ms. Allen and Ms. Holmes were involved in the planning of the robbery; however, he did not indicate that Mr. Green had ever testified in a manner contradictory to the testimony he presented upon direct examination. Nor would the State's proffer rise to the level of an inconsistent statement for purposes of Tennessee Rule of Evidence 613 because, as the prosecutor explained, the inconsistency was based upon Mr. Green's earlier omission rather than an earlier

statement. The trial court's actions following the bench conference only served to compound the error.

First, the trial court acquiesced in the prosecutor's request that Mr. Green's testimony be interrupted so that the witness could consult with his attorney. The record is clear that the prosecutor, and not Mr. Green, requested the recess. We can discern no legal standard that required this sequence of events. It was only after the recess, and resulting consultation with his attorney and the prosecutor, that Mr. Green indicated an unwillingness to undergo further questioning. The trial court first ruled that Mr. Green would be permitted to re-invoke his Fifth Amendment protection against self-incrimination as a total bar to any further questioning. This ruling is contrary to established legal principles. This court has held that

> A trial witness other than the accused in a criminal prosecution may not claim a blanket Fifth Amendment immunity from giving relevant testimony simply because certain questions which may be asked on cross-examination might elicit incriminating answers. The witness should be required to answer those questions seeking to elicit relevant non-incriminating information in the witness' possession. If the witness is asked for incriminating information on cross-examination he may claim the Fifth Amendment privilege at that time.

*State v. Dooley*, 29 S.W.3d 542, 551 (Tenn. Crim. App. 2000). This court has also recognized, however, that "the right of a co-defendant . . . to exercise his Fifth Amendment privilege against self-incrimination has a greater force than the right of a mere witness to the same privilege." *State v. Baker*, 751 S.W.2d 154, 161 (Tenn. Crim. App. 1987). Nevertheless, even a testifying co-defendant is not entitled to "blanket immunity" by asserting his protection against self-incrimination.

Moreover, even where Fifth Amendment protections may be claimed in the first instance, "[a] witness cannot discontinue testimony as to transactions already disclosed by the witness." *State v. Stapleton*, 638 S.W.2d 850, 855 (Tenn. Crim. App. 1982). "Once he discloses a fact, though incriminatory, he must testify with respect to the details of that fact." *Id.* (citing *Rogers v. United States*, 340 U.S. 367, 71 S. Ct. 438 (1951) (holding that "[d]isclosure of a fact waives the privilege as to details")). "As to each question to which a claim of privilege is directed, the court must determine whether the answer to that particular question would subject the witness to a 'real danger' of further crimination." *Rogers*, 340 U.S. at 374, 71 S. Ct. at 443. Thus, in this case, Mr. Green could not assert the privilege with regard to those facts already disclosed. Because he had already admitted his participation in the planning and execution of the robbery, he was obliged to answer questions about the details of that offense. Even if, as the State suggests, Mr. Green was asserting the privilege with regard to a future perjury prosecution, that assertion would not provide the witness with blanket immunity from testifying to matters unrelated to the alleged perjury.

As indicated, however, the trial court reversed its ruling that Mr. Green could refuse to testify on Fifth Amendment grounds but nevertheless concluded that it could not "compel" the witness to answer any further questions. The trial court articulated no legal basis for this conclusion,

and we can discern none. "A witness has no right to refuse to answer any and every question asked him in a judicial proceeding. He has only the right to invoke the Fifth Amendment with respect to matters that will incriminate him." *Stapleton*, 638 S.W.2d at 855; *see also* Tenn. R. Evid. 501 ("Except as otherwise provided by constitution, statute, common law, or by these or other rules promulgated by the Tennessee Supreme Court, no person has a privilege to . . . [r]efuse to be a witness [or] [r]efuse to disclose any matter . . . .").

After concluding that it would not compel Mr. Green to answer any more questions, the trial court again compounded the error by ruling that it would either strike the witness's testimony or allow the State to call Mr. Copeland to rebut Mr. Green's testimony. At that point, however, both the State and the defense had noted for the record that there would be no further questioning of the witness. As a result, the defendant objected to both potential courses of action. After Mr. Copeland requested a recess in order to consult with the Board of Professional Responsibility, the trial court ruled that it would not, in fact, permit the State to call Mr. Copeland as a witness and that the only "fair" thing to do was strike Mr. Green's testimony in order to protect the defendant's confrontation rights and the State's "right" to impeach the witness. The record is abundantly clear, however, that *the defendant wanted* Mr. Green's testimony in the record. As defense counsel pointed out, Mr. Green's revelation that the victims helped plan the robbery was favorable to the defense. The defendant did not assert that his confrontation rights were being violated and expressly waived any such assertion by requesting that Mr. Green's testimony remain. Further, although the State is certainly entitled, as is any party, to impeach a witness with a prior inconsistent statement, this entitlement does not rise to the level of a constitutional right akin to the defendant's right to confrontation of witnesses. In addition, as the State's proffer suggests, Mr. Green had not actually made a prior inconsistent statement and had, instead, omitted from his earlier discussions with the State the fact that the victims were involved. The State was free, as defense counsel suggested, to ask the trial court to declare Mr. Green a hostile witness and cross-examine him with regard to the earlier conversation. In any event, the trial court's decision to strike Mr. Green's testimony was based upon the earlier erroneous rulings and was, therefore, itself erroneous.

The trial court mistakenly concluded, in its ruling denying the defendant's motion for new trial, that "had the [c]ourt granted a mistrial . . . this defendant . . . would have had the right to file a motion [to dismiss the indictment] because [his] rights have been violated and this is double jeopardy." The law is clear, however, that retrial is not barred under double jeopardy principles when either manifest necessity requires the mistrial or the defendant consents to the mistrial order. *State v. Mounce*, 859 S.W.2d 319, 321-22 (Tenn. 1993). Here, not only did the defendant consent to a mistrial, he expressly requested one. In consequence, he would not have been entitled to object to a retrial on double jeopardy grounds.

Given the number of errors made with regard to Mr. Green's testimony and the prejudice to the defendant in striking the testimony, the trial court should have granted the defendant's request for a mistrial. At the time of the defendant's request, the focus of the trial had clearly shifted to the issue of Mr. Green's testimony and away from the defendant's right to a fair trial. We conclude that the trial court abused its discretion by refusing to grant a mistrial. In consequence, the judgment of the trial court is reversed and the case is remanded for a new trial.

*IV. Sentencing*

In his final complaint, the defendant asserts that the sentence is excessive. To facilitate any further appellate review, we will review the defendant's claim.

When a defendant challenges the length of a sentence, this court generally conducts a de novo review of the record with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d) (2003). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appellant. *Id.* If the review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing determination in the present case, the trial court, at the conclusion of the sentencing hearing, was obliged to determine the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and sentencing hearings, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant made in his behalf about sentencing, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b); -103(5); *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

At the time of the defendant's sentencing, the legislature had amended the sentencing code to address the implications of *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004). *See* T.C.A. § 40-35-114 (2003) (promulgating factors for enhancing sentence length) (amended Pub. Acts 2005, ch. 353, § 5 (effective June 7, 2005)). The transcript of the sentencing hearing indicates that the defendant was sentenced under the 2003 version of the Sentencing Act. Because the crimes occurred on May 5, 2005, sentencing was not governed by the 2005 amendments to the Sentencing Act. Had the defendant desired sentencing under the 2005 amendment to the Sentencing Act, he could have executed a waiver of his ex post facto protections. *See* T.C.A. § 40-35-114 (Supp. 2005), compiler's notes; *see also State v. Robert Lamont Moss, Jr.*, No. M2006-00890-CCA-R3-CD, slip op. at 5 n.1 (Tenn. Crim. App., Nashville, Dec. 4, 2007). No waiver appears in the record; thus, the sentence in this case was governed by the pre-2005 statute.

In enhancing the sentences to ten years for aggravated robbery and four years for attempted aggravated robbery, the trial court found that the defendant was a leader in the commission of the offenses. *See* T.C.A. § 40-35-114(3) (2003). In mitigation, the court concluded that the defendant, because of his youth, lacked substantial judgment in committing the offense; that the defendant committed the offense under such unusual circumstances that it is unlikely he had a

-15-

sustained intent to violate the law; and that the defendant had no criminal record and strong family support. *See* T.C.A. § 40-35-113(6), (11), (13) (2003).

The defendant does not contest the application of the enhancement and mitigating factors but argues that the trial court failed to properly weigh the factors in imposing the effective ten-year sentence. The weight given each enhancement and mitigating factor, however, is left to the discretion of the trial court as long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record. T.C.A. § 40-35-210 (2003), Sentencing Comm'n Comments; *State v. Moss*, 727 S.W.2d 229, 238 (Tenn. 1986); *State v. Kelley*, 34 S.W.3d 471, 479 (Tenn. Crim. App. 2000). Here, the record evinces no state law reason to reduce the length of the defendant's sentence. This does not, however, conclude our inquiry into the propriety of the defendant's sentence.

On June 24, 2004, the United States Supreme Court released its opinion in *Blakely*, holding that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Id.* at 301, 124 S. Ct. at 2536 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000)). The "statutory maximum" to which a trial court may sentence a defendant is not the maximum sentence after application of appropriate enhancement factors, other than the fact of a prior conviction, but the "maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Id.* at 303, 124 S. Ct. at 2537. Under *Blakely*, then, the "statutory maximum" sentence which may be imposed is the presumptive sentence applicable to the offense. *See id.*, 124 S. Ct. at 2537. The presumptive sentence may be exceeded without the participation of a jury only when the defendant has a prior conviction and/or when an otherwise applicable enhancement factor was reflected in the jury's verdict or was admitted by the defendant.

At the time of sentencing in this case, the Tennessee Supreme Court had held that, despite *Blakely*, the Tennessee Criminal Sentencing Reform Act of 1989 did not run afoul of the Sixth Amendment right to jury trial as interpreted in *Blakely*. *See State v. Gomez*, 163 S.W.3d 632, 654-61 (Tenn. 2005) (*Gomez I*), *vacated and remanded*, *Gomez v. Tennessee*,___ U.S. ___, 127 S. Ct. 1209, 167 L. Ed. 2d 36 (2007). On January 22, 2007, the United States Supreme Court released its decision in *Cunningham v. California*, 549 U.S. ___, 127 S. Ct. 856 (2007), holding that California's sentencing scheme, which had numerous similarities to Tennessee's sentencing scheme, did not survive Sixth Amendment scrutiny intact under *Blakely*. Following on the heels of *Cunningham*, on February 20, 2007, the United States Supreme Court vacated *Gomez I* and remanded that case for reconsideration in light of *Cunningham*, *see Gomez v. Tennessee*, ___ U.S. ___, 127 S. Ct. 1209 (2007).

On remand in *Gomez*, the Tennessee Supreme Court applied the principles of *Blakely* and *Cunningham* to determine that Tennessee's pre-2005 sentencing code violated Gomez' right to jury trial. *State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007) (*Gomez II*). The *Gomez II* court held that the trial court had committed plain error on constitutional grounds in applying factors for being a

leader in the commission of the offenses and in possessing or employing a firearm to enhance sentences. *Id.* at 743.

The defendant's failure to raise the *Blakely* issue prior to appeal deprives him of plenary review; however, this court may consider plain error upon the record under Rule 52(b) of the Tennessee Rules of Criminal Procedure. *State v. Ogle*, 666 S.W.2d 58, 60 (Tenn. 1984). Before an error may be so recognized, however, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). The word "plain" is synonymous with "clear" or equivalently "obvious." *United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 1777 (1993). "Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* at 732 (citations omitted).

In *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000), our supreme court adopted the standard announced by this court in *Adkisson*. There, we defined "substantial right" as a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense, and is constitutional in nature." *Adkisson*, 899 S.W.2d at 639. Our supreme court also adopted *Adkisson*'s five factor test for determining whether an error should be recognized as plain:

> "(a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is 'necessary to do substantial justice.'"

*Smith*, 24 S.W.3d at 282 (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before [a reviewing court] will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283. Our supreme court also observed that "the 'plain error must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *Adkisson*, 899 S.W.2d at 642) (internal quotation marks omitted).

Looking first at the adequacy of the record, we have before us the trial court record, including the presentence report and the transcripts of the trial and of the sentencing hearing, from all of which we can glean that the trial court enhanced the defendant's sentence for aggravated robbery from the presumptive sentence of 8 years to ten years and the sentence for attempted aggravated robbery from the presumptive sentence of three years to four years, *see* T.C.A. § 40-35-210(c) (2003) ("The presumptive sentence for a Class B, C, D and E felony shall be the minimum sentence in the range if there are no enhancement or mitigating factors. . . ."), on the basis that the defendant was a leader in the commission of the offenses. We deem the record adequate for review on the merits.

The issue at stake is the defendant's Sixth Amendment right to have a jury determine the factors that enhance his sentence beyond the presumptive sentence. In *Gomez II*, our supreme court determined that Gomez' sentence enhancement violated a clear and unequivocal rule of law for purposes of noticing plain error. As in *Gomez II*, the *Blakely* claim in the present case implicates a clear and unequivocal rule of law.

Looking next to whether the claimed violation of the Sixth Amendment adversely affected a substantial right of the defendant, the trial court utilized an enhancement factor that involved factual determinations of the "type . . . prohibited by Apprendi." *Gomez II*, 239 S.W.3d at 743. Thus, as in *Gomez II*, the enhancement of the sentence adversely affected a substantial right of the defendant.

"The fourth consideration for plain error review is whether the record indicates that the [d]efendant[] waived [his] Sixth Amendment claims for tactical reasons." *Id.* at 741. As in *Gomez II*, "the record in this case is silent and does not establish that the [d]efendant[] made a tactical decision to waive [his] Sixth Amendment claims." *See id.* Thus, the record evinces no basis in tactics or strategy for rejecting plain error review.

Finally, we examine the need for assuring substantial justice as a basis for noticing plain error. In *Gomez II*, our supreme court, in examining whether substantial justice had been availed or withheld, looked at the relative impact on sentence enhancement of Gomez' prior criminal record vis a vis the other, *Blakely*-infirm factors. The court commented that, as a reviewing appellate court, it was authorized to "[a]ffirm, reduce, vacate or set aside the sentence imposed," *id.* at 743 (quoting T.C.A. § 40-35-401(c) (2006)), suggesting that the court, if it could, would look at what sentence it would impose using the *Blakely*-compliant enhancement factor of prior criminal record to determine whether the trial court's use of other factors deprived the defendant of "substantial justice." In *Gomez II*, however, the court determined that the record of "criminal histories [was] not sufficiently well-developed [to allow a] determin[ation of] the proper sentences based on this enhancement factor alone." *Id.* at 743. In that situation, the *Gomez II* court apparently reasoned, the appellate court could not bring an appropriate, *Blakely*-compliant sentence into focus, and accordingly, the court held that, to ensure substantial justice, it must remand the case to the trial court for a "resentencing hearing at which the trial court will have an opportunity both to determine the full scope of the Defendants' criminal histories and to consider whether imposition of the maximum sentence on all convictions is appropriate." *Id.*

Because this defendant has no prior criminal convictions, there are no *Blakely*-compliant factors applicable to either sentence. Thus, the defendant was entitled to the presumptive sentence on each count and the need for assuring substantial justice requires that we recognize the error as plain.

## CONCLUSION

Because the trial court erred by denying the defendant's request for a mistrial, the judgment of the trial court is reversed, and the case is remanded for a new trial. Further, because the record does not establish any *Blakely*-compliant enhancement factor, the defendant was

-18-

constitutionally entitled to the presumptive sentence on each count.  Thus, the sentencing decision of the trial court is reversed.

 

                             _____

                             JAMES CURWOOD WITT, JR., JUDGE