STATE of Tennessee, Appellee,

v.

Charles Wade "Bud" STAPLETON,
Appellant.

Court of Criminal Appeals of Tennessee,
at Knoxville.

June 17, 1982.

Amended June 29, 1982.

Permission to Appeal Denied By
Supreme Court Sept. 13, 1982.

R. Grant Hyatt, R. Wayne Culbertson, Richard Spivey, Kingsport, for appellant.

William M. Leech, Jr., Atty. Gen., J. Andrew Hoyal II, Asst. Atty. Gen., Nashville, Carl K. Kirkpatrick, Dist. Atty. Gen., Steven H. Jones, Asst. Dist. Atty., Blountville, for appellee.

## OPINION

TATUM, Judge.

The defendant, Charles Wade "Bud" Stapleton, was indicted for aiding and abetting first degree murder, aiding and abetting armed robbery, and two counts of being an habitual criminal. He was convicted of aiding and abetting second-degree murder [1] and was sentenced to a term of 50 years in the State penitentiary. On this appeal, the defendant presents sixteen issues for review. After considering them, we conclude that the judgment of conviction must be affirmed.

The record clearly establishes that Ronald Harries, armed with a pistol, entered the "Jiffy Market" in Sullivan County at approximately 9:30 P.M. on January 22, 1981. Two employees were working at the market; one of them was Elizabeth Lane and the other was her 18-year old cousin, Rhonda Greene. When Elizabeth Lane was cleaning up on the outside of the market, she noticed that a pickup truck with a white camper was parked in front of the nearby Lynn Garden Hardware building. She heard a shot, ran into the store, and observed her cousin lying on the floor near the cash register. Harries shot at her but missed. She begged and pleaded with him not to shoot her and he told her, "I'll kill you, get the money." He took $1500 in cash and food stamps. He then ran toward the hardware building.

Scott Fletcher had just left the Jiffy Market. He was about to get into his car when he saw Harries walk to the Jiffy Market from the direction of the hardware building. He heard one shot and then another then ran toward the highway and screamed for someone to call police. He saw Harries leave the Jiffy Market and walk behind the hardware store.

The defendant and Harries had become friends in Cleveland, Ohio. The defendant had previously lived in Kingsport and his family still lives there. On January 21, 1981, the defendant brought Harries to Kingsport in his green and white pickup with a white camper. Harries and the defendant socialized and stayed together until Harries later went to Florida. Harries was a guest of the defendant at the homes of the defendant's relatives.

Ralph Page testified that he had known the defendant since about 1959 and had given him a 1965 green and white Chevrolet pickup truck with a white camper. On January 22, 1981, the defendant and Harries came to Page's house and asked to borrow a gun. Page loaned the defendant a .38 caliber Smith & Wesson revolver. About 11:30 or 12:00 that same night, defendant and Harries returned to Page's house with the gun and one of them said, "We just took off a place." The pistol was loaded when Page gave it to defendant and two shots had been fired from it when it was returned to Page. After the three began drinking, Harries said that he had just shot a girl but believed he had only glazed her head. The defendant said that he was parked in his truck in front of Lynn Garden Hardware when he saw "A guy running out in the street hollering, trying to stop cars." The defendant stated that when he saw the man screaming, he "come up by the Jiffy Market, up toward Lynnview School and picked up Harries on the run." [2] On this second trip to Page's home, Harries and the defendant were in the de-

---

1. The trial judge held that second-degree murder does not "trigger" the habitual criminal statute so the counts charging the defendant with being an habitual criminal were not submitted to the jury. The indictment charges that the defendant was previously convicted of six felonies.

2. Other evidence establishes that this is the area to the rear of the hardware store.

fendant's mother's car. On this occasion, they made arrangements to go to Valdez, North Carolina to get tires.

The next day, the trio went to Valdez, North Carolina in Page's automobile. While there, they visited with Page's mother and sister. Harries suggested that they would be well advised to dispose of the gun. Page gave a man named Charles Barker $50 in currency and the Smith & Wesson revolver for a set of tires. Other evidence established that this revolver was the murder weapon.

After the three men had returned to Kingsport from North Carolina, the automobile, then occupied by Page and the defendant, was stopped by Officer Buster Brown, who was looking for Harries. The defendant told the officer that his name was "Mullins" and that he had no billfold or identification on him.

On January 24, Harries came to Page's home and offered to pay Page $200 to drive him to Tampa, Florida. Page drove Harries to Florida and upon arriving in Tampa, he learned that the defendant was looking for him. Page telephoned the defendant and the defendant told him that he (the defendant) had been picked up and that an "all points bulletin" was out on Page. The defendant told Page to stay in Florida and that he was going to Florida. The defendant also cautioned Page to conceal his license tags and to "keep his mouth shut." Page returned to Kingsport and reported to the Kingsport Police Department.

On January 26, 1981, the defendant was arrested in Florida at the Tampa International Airport. He had been traveling with an airline ticket from Knoxville to Atlanta to Tampa. The ticket was issued to "Billy Martin."

The appellant gave statements detailing his activities with Harries after they arrived in Kingsport from Ohio on the evening of Wednesday, January 21, 1981. They commenced drinking soon after arriving and stayed Wednesday night with the defendant's niece, Carolyn Cribbs. He stated that he and Harries spent the next day at his mother's house where he left Harries at approximately 7:30 P.M. and drove his pickup truck to Ralph Page's house for two tires. He remained at Page's house until 9:00 P.M., then went to his mother's home after buying a "12 pack" of beer. He stated that he arrived at his mother's home shortly after 10:00 P.M. and found Harries there, separating and stacking money and food stamps. According to the defendant, when he asked Harries where he got the money, Harries replied, "I went out and made it; don't worry about it."

Carolyn Griffith, defendant's niece, testified that the defendant and Harries spent the night of January 21 at her house. They left on the morning of January 22 and returned to her house at approximately 11:30 that night. She testified that Harries gave her a quantity of food stamps which were obviously stolen, as they were not in books. She testified that the defendant went into the children's room and gave two of them $5 each. They had asked him for money the previous night but he told them that he had "no change." They left her home around midnight.

The defendant did not testify. Harries testified on the defendant's behalf, and said that on the day of the murder and robbery, the defendant left him at defendant's mother's home about 6:00 P.M. or 7:00 P.M. and that Page picked him up between 7:00 P.M. and 7:30 P.M. Harries testified that he returned to the defendant's mother's home approximately 10:00 P.M. and the defendant returned about 10:30 P.M. or 11:00 P.M. The defendant was driving his truck. He testified that he and the defendant returned to Page's home about midnight.

Harries' testimony is not clear and explicit as he frequently refused to answer questions on the ground that the answers would incriminate him. He testified broadly that he knew of his own knowledge about the murder and the robbery and knew of his own knowledge that the defendant was not

there. He testified that Page was driving the getaway car.[3]

In Issues 1, 2, and 16, the defendant attacks the sufficiency of the evidence. He complains that he was convicted upon Page's testimony of his confession to Page and that the confession was uncorroborated. We note at the outside that there was abundant, overwhelming and undisputed evidence, aside from the defendant's alleged confession to Page to prove the *corpus delicti*.[4] In *Franklin v. State,* 513 S.W.2d 146 (Tenn.Cr.App.1974), this court reiterated the rule that a confession may sustain a conviction where there is other evidence to show the commission of the crime by someone. The law on this proposition was fully discussed in *Taylor v. State,* 479 S.W.2d 659 (Tenn.Cr.App.1972):

"The corpus delicti cannot be established by a confession alone. It can be when taken in connection with other evidence, direct or circumstantial, corroborating the confession. If from all the evidence the corpus delicti and the guilt of the defendant is proved beyond a reasonable doubt it is the duty of the jury to convict. *Ashby v. State,* 124 Tenn. 684, 139 S.W. 872 (1911). If our cases that refer to *Ashby v. State* are consulted, it will be seen that they are dealing with the amount of corroboration necessary to make out the corpus delicti. They do not say that the defendant must be connected to the crime by evidence outside of the confession.

The courts are said to be agreed that evidence in corroboration of a confession need not connect the defendant with the crime charged and that such connection can be shown by his confession without corroboration on that point. A confession may sustain a conviction where there is other evidence sufficient to show the commission of the crime by someone. 30 Am.Jur.2d, Evidence, Sec. 1137. It has

been pointed out in our State that such was the rule at common law and it was not error to refuse to charge the jury that there must be corroborating circumstances before a conviction can be sustained on a confession of guilt. *Williams v. State,* 80 Tenn. 211 (1883)."

There was also substantial evidence of the defendant's guilt other than Page's testimony. Elizabeth Lane observed a pickup truck with the unique white camper parked in front of the hardware building near the time the crime was committed. Harries walked to the Jiffy Market from the direction of the hardware building before the crime was committed and ran in that direction afterward. The defendant was using the truck at the time of the commission of the crime.

Other evidence established that the defendant was with Harries shortly before and shortly after the crime was committed. On the night before the robbery and murder, the defendant declined Carolyn Griffith's children's request for money but sought them out immediately after the crime was committed and gave them $5.00 each while his companion Harries gave Carolyn Griffith stolen food stamps. The defendant fled to Florida after the crime under an assumed name and gave a police officer a fictitious name the day after the crime. There are other circumstances indicative of the defendant's guilt, other than the testimony of Page.

The evidence as a whole is sufficient to establish to a rational trier of fact the appellant's guilt beyond a reasonable doubt. We therefore overrule Issues 1, 2, and 16. Rule 13(e), T.R.A.P.

■ The defendant next insists that the court erred in admitting into evidence a photograph of the crime scene showing a pool of blood on the floor. The defendant says the photograph had no probative value

---

3. In effect, Harries escaped cross examination by relying upon the Fifth Amendment.

4. The *corpus delicti* was established by medical evidence and testimony of Elizabeth Lane and other witnesses at the crime scene.

and was inflammatory. This was a black and white photograph of the inside of the Jiffy Market. It depicts a black spot on the floor which was identified by witnesses as being blood. The body of the victim was not shown. The photograph was admissible to show the scene of the crime. It was not gruesome, horrifying, or inflammatory. It was therefore admissible in evidence. *State v. Banks,* 564 S.W.2d 947 (Tenn.1978).

In assignment 4, the defendant says,

"The court erred in allowing the State to recall a defense witness after said witness had been excused by the court because said witness stated that he intended to assert his Fifth Amendment right against self incrimination to all further cross examination questions asked by the State."

Ronald Harries took the witness stand at the behest of the defendant. On direct examination, he testified as to occurrences between January 21, 1981, when he left Cleveland with the defendant, and his subsequent arrest in Tampa, Florida, after the murder of Rhonda Green. He testified that he was with the defendant on January 22 until about 6:00 or 7:00 P.M. and rejoined the defendant about 10:30 or 11:00 P.M. While he did not admit involvement in the murder, he did testify that he knew of his own knowledge that the defendant was not present at the scene and that Page drove the getaway car. On cross examination, he refused, on Fifth Amendment grounds, to answer numerous questions. Court adjourned during the cross examination of Harries and his attorney advised him in open court to refuse to answer all other questions in the case on Fifth Amendment grounds. Notwithstanding the advice of Harries' attorney, the court permitted further cross examination by the State the next morning, saying that Harries had waived his Fifth Amendment rights with reference to matters he testified to on direct examination.

■ A witness has no right to refuse to answer any and every question asked him in

a judicial proceeding. He has only the right to invoke the Fifth Amendment with respect to matters that will incriminate him. A witness cannot discontinue testimony as to transactions already disclosed by the witness. Once he discloses a fact, though incriminatory, he must testify with respect to the details of that fact. *Rogers v. United States,* 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951). A witness who testified on direct examination is bound to answer questions on cross examination with respect to the testimony that he gave on direct. *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

The trial judge properly permitted further cross examination as it was the prerogative of the court and not the witness or the witness's attorneys to determine whether the witness could properly refuse to answer any specific question on Fifth Amendment grounds. No right of the defendant was violated by cross examination of the witness.

■ In the next issue, the defendant complains that a newspaper reporter was permitted to testify as to matters that the reporter had caused to be printed in a local newspaper during trial. The defendant reasons that this violates the rule prohibiting jurors from reading newspaper accounts of the progress of a trial. The distinction is that newspaper accounts are hearsay. The testimony of the newspaper reporter from the witness stand with respect to the matters personally known to the reporter-witness is not hearsay. There is no rule which excludes competent evidence merely because it had been published in a newspaper. The jury did not read the newspaper; it heard only the competent testimony of the witness.

■ There is no merit to the defendant's contention that one cannot be convicted of aiding and abetting second degree murder until the principal in the first degree has been convicted. T.C.A. § 39–110.

■ The defendant contends that the indictment charging murder should have been

dismissed because he was only charged with accessory after the fact to murder when he waived extradition. At a pretrial hearing, the defendant testified that the sheriff told him before he waived extradition that the charge would be changed.[5] There is no merit to this issue.

The defendant next contends that he was entitled to a change of venue because of pretrial publicity. He cites *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) where a 20 minute film of the confession of a defendant had been broadcast three times by a television station located in the community where the crime and the trial took place. In the case before us, there was much publicity regarding the case but none of the nature of that in *Rideau.* In *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), the court characterized *Rideau* as involving "a trial atmosphere that had been utterly corrupted by press coverage." *Murphy* went on to hold:

"Qualified jurors need not, however, be totally ignorant of the facts and issues involved.

'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' "

In *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 2299, 2303, 53 L.Ed.2d 344 (1977), the United States Supreme Court reiterated the holding in *Murphy* by stating that "Extensive knowledge in the community of either the crimes of the putative criminal is not sufficient by itself to render a trial constitutionally unfair" in the absence of an utterly corrupt trial atmosphere.

Not all of the jurors who were examined in the *voir dire* had read accounts of the murder. The jurors who were selected for the trial of the case stated that they could decide the case based on the evidence presented at trial without regard to pretrial publicity to which they may have been exposed. The critical question is whether the jurors who actually hear the case are prejudiced. *Lackey v. State,* 578 S.W.2d 101 (Tenn.Cr.App.1979). This is a question for the trial judge and a strong case must be presented before an appellate court will reverse the determination of the trial judge. *State v. Hoover,* 594 S.W.2d 743 (Tenn.Cr.App.1980). This issue is without merit.

The State was originally seeking the death penalty. The defendant complains that one juror was excused because she stated that she would "automatically vote against the death penalty" and would "refuse to consider the imposition of capital punishment in this case regardless of the law and the evidence." The juror also stated that her reservations about capital punishment "probably would" prevent her from making an impartial decision as to the defendant's guilt or innocence. The juror was properly excused for cause. See *State v. Harrington,* 627 S.W.2d 345 (Tenn.1981).

The defendant next states that he should have been granted a mistrial when State's witnesses on two occasions made remarks about his prior prison record or bad reputation. In both instances, the evidence was elicited from the witnesses on cross examination. In the first instance, defense counsel asked the following question and received the following answer:

"Q. I believe you testified at the preliminary hearing that you knew him, but just around the neighborhood, is that right?

A. That's what I was going to get straightened up.

---

5. We do not hold that the indictment would be invalid even if the charge had been altered, without the defendant's knowledge, after the waiver of extradition. We do not reach this question.

Q. O.K. Go Ahead.

A. I was getting this Stapleton confused just by hearing in the paper and stuff about this man that walked by my street all the time. And it was Frank Stapleton, all the Stapletons where I used to live, they all live over there. Molly's mother lived above me, and then, Frank, I don't know what kin he is to them, but I got—I was just connecting Bud with him because he had the law—the law had been up there a lot, and like I said, just by reading the paper where he had been in trouble and stuff."

The court instructed the witness not to delve into gossip and further instructed the jury to disregard this testimony. The trial judge's instruction to the jury cured any error and a mistrial was not required. *Sullivan v. State,* 513 S.W.2d 152 (Tenn.Cr. App.1974); *Klaver v. State,* 503 S.W.2d 946 (Tenn.Cr.App.1973); *Holder v. State,* 490 S.W.2d 170 (Tenn.Cr.App.1972).

■ The other incident for which the defendant says that he was entitled to a mistrial arose from the defendant's cross examination of the State witness, Ralph Page:

"Q. Now, you have known Mr. Stapleton for several years.

A. Yes, sir.

Q. How long would you say that you have known him?

A. Either back in '59 or the early part of '60.

Q. And you stated that you had not seen him a whole lot up until about January 22, except for in July?

A. I seen him in '65, '66, somewhere in there, '67. I was in Cleveland, Ohio, and me and Bud had an apartment together in Berea, Ohio.

Q. That was in '65 or '66, you say?

A. Or '67, somewhere along in there.

Q. Then from that point in time, you did not see him until July of what—'80?

A. That's right.

Q. Then you saw him back when you had the apartment, you saw him again in July of '80 when he came in here, and you people went to Valdez, North Carolina?

A. I seen him in the penitentiary in Columbus, Ohio.

MR. CULBERTSON: If Your Honor, please, I object to that."

The trial judge carefully instructed the jury to disregard the witness's statement that he had seen the defendant in the penitentiary at Columbus, Ohio and cautioned defense counsel that the type of examination he conducted would inevitably bring out this type of response. Again, any error was cured by the trial judge's instruction to the jury. Moreover, there was no motion for a mistrial and the error, if any, was invited by the defendant. There is no merit in Issue 11.

■ In Issue 12, the defendant says that the following argument of the District Attorney General constituted a comment on his failure to testify:

"What did they offer you in the way of defense, the very man that shot her dead, that's their defense ... what did Bud Stapleton offer you in the way of defense? He offers you a cold-blooded murderer, a liar, a dangerous man ... They have offered you Ronald Haries as a defense witness ...."

The above argument was not a comment upon the defendant's failure to testify. Issue 12 is overruled.

The defendant makes several other attacks upon the argument of the District Attorney General. We have considered these various incidences and find that there is no merit in this issue.

■ In Issue 13, the defendant complains of the following jury instruction:

"All persons present, aiding and abetting, or ready and consenting to aid and abet in any criminal offense, shall be deemed principle (sic) offenders and punished as such.

Mere presence at the scene of the crime, however, would not make a defendant a principle. (sic) There must be some evidence, at least circumstantial, that he participated in the crime. The law does not require a strict, actual, eye witness present. Rather, if at the time of the commission of the crime, a defendant was assenting to it, was in a position to aid the perpetrator and was ready and willing to give such aid if necessary, then he can be considered to be an aider and abettor in the commission of the crime."

The defendant does not question the accuracy of the charge as given but states that the court should have added "This law means that the defendant need not be in eyesight or hearing distance of the crime." No special request to this effect was made. He argues that the charge as given was prejudicial in that the jury could erroneously assume that the State is not required to place the defendant at the scene of the crime with "eye witness testimony." The defendant's argument is based on an incorrect premise. The actual or constructive presence is necessary. *Watson v. State,* 158 Tenn. 212, 12 S.W.2d 375 (1928). It is not necessary that this fact be proved by direct "eye witness" evidence; it, like any other fact, may be proved by circumstantial evidence. We think that the charge is correct and that if further elaboration had been desired, it was incumbent upon the defendant to make a special request. *Robinson v. State,* 513 S.W.2d 156 (Tenn.Cr.App.1974).

In his brief, the defendant questions other instructions given by the trial judge. These instructions, however, were not incorporated in the motion for a new trial. None constitute plain or fundamental error and therefore we cannot consider them. *Massey v. State,* 592 S.W.2d 333 (Tenn.Cr.App.1979).

The defendant next complains because the names and information regarding two members of the venire from which his jury was sworn did not appear on a list furnished him. He cites T.C.A. § 40–2505 which is now superceded by Rule 24(g), T.R.Cr.P.:

"Upon request, the parties shall be furnished with a list of members of the jury panel; containing the following information with respect to each: name, address, occupation name of spouse, occupation of spouse."

The record does not indicate that the defendant requested the list. Further, there is no showing or allegation of prejudice or injury. See *Floyd v. State,* 596 S.W.2d 836 (Tenn.Cr.App.1979); *Rudd v. State,* 531 S.W.2d 117 (Tenn.Cr.App.1975); *Cooley v. State,* 174 Tenn. 168, 124 S.W.2d 250 (1939).

In Issue 15, the defendant alleges that he was convicted of a crime for which he was not indicted. As stated, he was indicted for aiding and abetting and his reasoning is that T.C.A. § 39–109 abolished the offense of "aiding and abetting murder or any other crime." We disagree. T.C.A. § 39–109 merely removed the common-law distinction between aiders and abettors (principals in the second degree) and principals in the first degree. *Rockwell v. State,* 550 S.W.2d 250 (Tenn.Cr.App.1976). An indictment charging one with aiding and abetting another in the commission of a crime still charges a criminal offense.

The appellant states that the trial court erred in admitting into evidence statements given by him to the police. Upon previous information, the police stopped the defendant in his mother's car on the morning of January 24, 1980. They were looking for Harries, though they did not know his name at that time. They had evidence that Harries committed the murder and robbery; the defendant at the time was not thought to be implicated. The officers drew their pistols for fear that Harries might be concealed in the car and also in apprehension of their safety. After determining that Harries was not in defendant's car and that defendant was un-

armed, they holstered their weapons. The officers were permitted to make this investigatory field stop and frisk for weapons based on reasonable suspicion. *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

▉ Upon determining that the defendant was unarmed and that the murderer was not present, the police officers, after holstering their weapons, requested the defendant to come to the safety building with them. The defendant was permitted to drive his automobile to the safety building. The police had many other witnesses at the safety building and it was necessary for the defendant to wait there for several hours before he could be interviewed. A lengthy suppression hearing was held and the events that occurred were summarized by the trial judge as follows:

"(T)he police were only seeking the name of a known acquaintance who did fit the description of the person who allegedly committed the crime. It is clear that the defendant was requested to come to the police station, that he went to the police station voluntarily, that he remained there voluntarily, that he wandered around at will, that he was not confined or questioned even behind closed doors, although on occasion, a door may have been closed to the interrogation room. He was permitted to, and did wander into the hall, to the restroom which was adjacent to an outside door, outside exit; he could have left at any time. Again the defendant saw himself as a witness helping the police so as to pass the suspicion, or point the finger of guilt to someone else."

The defendant was not held *incommunicada* at the police station and was seen moving about freely therein. He made a telephone call to his girlfriend and told her that he was not a suspect and that it appeared that Harries was the suspect. At the time, the police officers were primarily interested in obtaining information about Harries, and the defendant telephoned his girlfriend for them to ascertain his last name. Miranda warnings were not given to the defendant.

The trial judge found that the defendant was not in custody of the police and that he was free to go and come as he pleased. He was not guarded or kept under surveillance. The evidence does not preponderate against the finding of the trial court, therefore the trial court's findings are binding here. *Braziel v. State,* 529 S.W.2d 501 (Tenn.Cr. App.1975).

Although the statements were given in a police station without Miranda warnings, the statements were admissible under the circumstances of this case. *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

The statements were exculpatory in nature and contained matters that were immaterial or established by other proof. We are convinced beyond a reasonable doubt that the admission of these statements did not affect the result of the trial.

The judgment below is affirmed.

BYERS and CORNELIUS, JJ., concur.