IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 22, 2011

## STATE OF TENNESSEE v. JAVORIS SPARKMAN

**Direct Appeal from the Circuit Court for Maury County**
**No. 17922    Stella L. Hargrove, Judge**

---

**No. M2010-01521-CCA-R3-CD - Filed May 18, 2012**

---

A Maury County jury convicted the Defendant-Appellant, Javoris Sparkman, of one count of first degree murder, two counts of felony murder, and nine counts of attempted first degree murder. For the first degree murder in count one, Sparkman received a sentence of life. The trial court merged the first degree felony murder in count two with the first degree murder in count one. For the first degree felony murder in count four, Sparkman received another life sentence, to be served consecutively to the sentence of life for the first degree murder in count one. For each attempted first degree murder, Sparkman received a sentence of fifteen years, to be served concurrently. In total, Sparkman received two sentences of life plus 15 years. On appeal, Sparkman argues the trial court erred in (1) failing to charge the jury with self-defense; (2) refusing to  allow individual voir dire of prospective jurors; (3) refusing to excuse a juror with prior knowledge of the case; and (4) denying a motion for change of venue. Upon our review, the judgments of the trial court are affirmed, except for counts one and two which are vacated and the case is remanded for entry of a single judgment reflecting the merger of counts one and two.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed
In Part, Vacated In Part, and Case Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROBERT W. WEDEMEYER, J., joined.

L. Samuel Patterson, Columbia, Tennessee, for the Defendant-Appellant, Javoris Sparkman.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; T. Michael (Mike) Bottoms, District Attorney General, and Kimberly Cooper, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

In the early morning hours of April 13, 2008, the victims in this case, Jason Alfonzo Castro, Juan Castro, Patricia Garcia, Jose Daniel Castro, Sara Garcia, Carlos Landauro, Leonicio Santas, Jose Valadiz, Jonathan Trugas, Dalila Cortinas, and Jonathan Zaragoza, were traveling in a Ford Expedition truck when it came under gun fire from a gold car. Juan Castro and Patricia Garcia were fatally shot, and several of the other passengers were critically injured. Sparkman, along with three other men, was later determined to be inside the gold car from which the gunshots were fired. He was arrested, indicted, and charged with the instant offenses.

The events leading up to the shooting were, in large part, not disputed at trial. Jose Castro testified that he and several members of his family went to a party at the National Guard Armory ("the Armory") in Columbia, Tennessee on the night before the offense. It was a "Quinceanera" or a "Sweet Fifteen" party to which his younger brother, Juan Castro, age ten, had been invited. Jose Castro drove his family in his 1997 Ford Expedition truck, which was a customized orange color with metal flakes, to the party. They arrived between 9 and 9:30 p.m. and remained at the party for "about two hours." The party ended "around midnight" because of a fight. Jose explained that "somebody said something to his dad and my uncle went and confronted that guy about it." Although Jose was not personally involved in the fight, he attempted to remove his uncle from the fight. The police arrived and began to escort everyone out of the party.

Asked if he noticed Sparkman at the party, Jose Castro said "[Sparkman] was the only black guy there." Jose Castro also noted that Sparkman, who was wearing an orange shirt, was with two other men, one wearing a green shirt and the other a yellow shirt. Jose Castro said that as his family was leaving the party, his uncle pushed someone wearing a yellow shirt. Jose Castro had ten passengers in his truck when he left the party. Sarah Garcia, Jose Castro's girlfriend, was in the front seat. Carlos Landauro, Patricia "Patty" Garcia, Jonathan Trugas, and Jose Valadiz, were located in the second row seat. Juan Castro, Delila Cortinas, Jonathan Zaragoza, Jason Castro, and another friend were in the third row seat.

As Jose Castro went over the Duck River Bridge, he noticed a car behind him. Jose Castro said that the car would "slow down and then catch up to me again and then it would catch up and it would slow back down and it just continued throughout the whole way till I got to the Coca-Cola Plant." Upon arriving at the Coca-Cola Plant, the car behind Jose Castro "turned the lights off." After telling the passengers that he did not like something about the car behind him, Jose Castro "heard gunshots and felt his body go numb." He swerved into the gold car, called 911, and attempted to get away. The other passengers in the truck told him that three of them had been shot, and Jose Castro drove to the Williamson County Hospital.

Jose Castro was shot in his upper right thigh, which required six months for him to recuperate. While at the hospital, Jose Castro was told that his brother, Juan Castro, and Patricia Garcia had died. Although Jose Castro did not know how many shots were fired at his truck, he stated "It was just a lot of them. I just heard and saw sparks. It wasn't no regular handgun[.]" Prior to the instant offense, Jose Castro did not know Javoris Sparkman, Eric Guerrero, Robert Guerrero, or Charles Kelley. Jose Castro denied ramming the car that was behind him before shots were fired at his truck. Asked if anyone from his truck fired any weapons or did anything to the other car, Jose Castro replied, "No, sir."

Carlos Landauro testified and substantially corroborated the testimony of Jose Castro as to the events on the night of the offense. Although Landauro did not know Sparkman prior to the offense, he remembered seeing him at the party. He distinctly recalled Sparkman because Sparkman was wearing an orange shirt and "[Sparkman] was the only one fighting and stuff . . . The cops was trying to hold him and he was trying to keep fighting."

Upon leaving the party, Landauro said he rode home with Jose Castro and that there were no problems in the truck at that time. Landauro said,

> When I saw other sparks coming inside the truck. Like we was going to Franklin passing the Coca-Cola Plant, started getting dark and dark and then all of a sudden on the right side - - on the left side of the truck, it was bullets coming in and all I could see just fire going through it so I just ducked down because I was afraid.

Asked if he could see where the sparks were coming from, he replied "All I could see just coming through the windows, that's all I could see." Landauro "ducked down" and did not see the car next to him. However, he emphasized that the sparks were coming from the left side of the truck. Landauro was not injured by the bullets; however, he was hit by glass.

Landauro said that Patricia Garcia "went down" into the seat with him. He believed that she was "trying to duck down," but later discovered that she had been shot. After the shooting, the truck started to swerve in an effort "to get the other guys off the truck." Although he recalled the truck hitting the other car, he did not know how many times. While in the truck, Landauro heard Juan Castro say that he had just been shot and that he was bleeding. Landauro also recalled seeing Robert and Eric Guerrero at the party because Eric Guerrero was wearing green clothes and Robert Guerrero was wearing a yellow jacket.

Sarah Garcia, age nineteen, substantially confirmed the testimony of Jose Castro regarding the events on the night of the offense. She confirmed that her sister, Patricia "Patty" Garcia, age twenty-four, rode with them to the party at the Armory. She noticed Sparkman on the night of the offense because he was wearing bright orange clothes. On their

return home from the Armory, Sarah Garcia recalled that a car "pull[ed] up and out of the front passenger seat [she] saw fire or a big light." She was shot in her left leg and suffered "a femur fracture, a shattered bone, broken vein, and my artery as well." She was in the hospital for ten days, walks with a limp, and has a permanent metal rod in her leg.

Jason Castro, age eleven, rode with his mother and father to the party at the Armory on the night of the offense. He left the party with his brother, Jose Castro, and his other brother, Juan Castro, age sixteen, was with them in the back seat of the truck. When the shooting started, Jason Castro saw sparks.

Jeremy Humphrey of the Columbia Police Department was the first officer to respond to the area of the shooting. Upon arrival, he observed "glass all over [the pavement]" and a "bright orange tennis shoe in the road." He then observed a gold car situated diagonally in a ditch with other police cars around it. Armed with his shotgun, Officer Humphrey exited his car and ordered everyone to exit the gold car. Officer Humphrey knew the driver, Robert Guerrero, from prior experience and confirmed that he was the owner of the gold car. Officer Humphrey also observed that Robert Guerrero was dressed in black and yellow clothing. While Officer Humphrey was talking with Robert Guerrero, Eric Guerrero "came up out of the ditch on the driver's side of the car." Eric Guerrero was wearing a green shirt.

Officer Humphrey initially believed that Robert and Eric Guerrero were the victims of road rage. However, after officers found an SKS rifle near the front of the gold car, Robert and Eric Guerrero were arrested. Following the Guerrero's arrest, the officers were notified that the Williamson County Hospital had received several gunshot victims in their emergency room. While Officer Humphrey assisted in performing gunshot residue tests on the Guerrero brothers, Eric Guerrero asked "how long ago you had to fire a rifle before gunshot residue would show up on your hands or go away." Eric Guerrero further commented that "they had been out at the Armory and . . . had been into it with someone and that was the same car that had ran them off the road." Eric and Robert Guerrero provided different descriptions of the vehicle they alleged ran them off the road. Officer Humphrey then transported Eric Guerrero to the detective bureau.

Officer Jeremy Haywood of the Columbia Police Department also responded to the Armory on the night of the offense. Upon entering the Armory, he immediately observed Sparkman in a "heated argument" with a security officer. He described Sparkman as "irate, screaming, yelling, waving his hands, arms, refusing to obey the county officer and leave the property." Officer Haywood approached Sparkman, ordered him to leave, and Sparkman complied. Officer Haywood then followed Sparkman outside of the Armory to ensure no other problems. He observed Sparkman and another Hispanic male enter a gold Grand Prix or Pontiac. He testified that Sparkman entered the passenger side of the car. Once the car began to move, Officer Haywood returned to the inside of the Armory. Officer Haywood

-4-

said Sparkman wore a "solid orange t-shirt" on the night of the offense; however, he could not recall Sparkman's shoes.

Later in the evening, Officer Haywood responded to the area of the shooting. Officer Haywood estimated "ten or fifteen minutes" between when he saw Sparkman enter the gold car at the Armory parking lot and receiving the shooting call. Upon arrival, he observed the same car that he saw Sparkman enter at the Armory in a ditch. Although he asked the officers already on the scene if Sparkman was present, Sparkman was not at the scene. Three days later, Officer Haywood participated in the grid search of the area and observed a solid orange shirt that was found hanging on a tree in the woods. Officer Haywood believed the orange shirt was the same shirt that Sparkman was wearing at the Armory.

On cross-examination, Officer Haywood said that the other Hispanic man who entered the gold car at the Armory also entered the passenger side of the car. However, Officer Haywood did not observe which man was in the front or back seat of the passenger side of the car. Although he saw the gold car begin to move in the Armory parking lot, he could not confirm whether it left the parking lot.

Officer Tracy Duke of the Columbia Police Department was on routine patrol at the Armory on the night of the offense. Officer Duke observed a man in "bright yellow clothing and baggy pants" clutching the front of his pants. He inquired to his supervisor whether the man should be checked for weapons. Because the man was leaving the Armory, Officer Duke was instructed only to observe the man to ensure he left the Armory. Officer Duke said that the man drove away in a gold Pontiac with two other men also inside of the car. The front seat passenger was wearing an orange shirt, and the passenger located in the back seat on the driver's side was wearing green clothing. Officer Duke also responded to the scene of the shooting. He substantially confirmed the testimony of Officer Humphrey and recovered the SKS rifle "directly in front of where [Eric Guerrero] was standing[.]"

Officer Brad Ribley of the Columbia Police Department also responded to the Armory and the scene of the shooting on the night of the offense. The camera on his car recorded the events at the Armory and his arrival at the shooting scene. The recording from his car was admitted into evidence. He viewed the inside of the gold car at the scene and observed that the back seat "trapdoor" was down.

Officer Scott MacPherson responded to the Armory on the night of the offense. The camera in his police car was activated and recorded the events at the Armory from his arrival to his departure. He also responded to the scene of the shooting and performed gunshot residue (GSR) tests on Robert and Eric Guerrero. After performing GSR tests, Officer MacPherson collected, tagged, logged, and eventually forwarded the packages to the Tennessee Bureau of Investigation (TBI) for analysis. He identified the test for Eric

Guerrero, and the test for Robert Guerrero. He also identified the SKS rifle and the magazine that was inside of it as items recovered from the scene.

Laura Hodge, a TBI special agent, testified as an expert in GSR analysis. She performed GSR tests on Juan Castro, Robert Guerrero, and Eric Guerrero. The test for Eric Guerrero showed that elements indicative of GSR were absent. In other words, Agent Hodge did not observe elements typically associated with gunshot residue primer on Eric Guerrero's hands. In regard to Robert Guerrero and Juan Castro, Agent Hodge said the test results were inconclusive. An inconclusive result meant that Agent Hodge could not eliminate the possibility that Robert Guerrero or Juan Castro could have fired, handled, or was present near a gun when it was fired. Unlike absent findings, Agent Hodge explained that "some level of one, two or all three of the elements [of gun primer residue]" was present but not the normal amount.

Dr. Amy McMaster performed the autopsy on Patricia Garcia and Juan Castro. Dr. McMaster explained that Patricia Garcia died as a result of a gunshot wound to her head. She estimated that the bullet wound was "immediately fatal." The bullet entered the back left portion of the scalp and traveled from back to front and left to right. Dr. McMaster recovered a medium caliber bullet from the right frontal portion of Patricia Garcia's brain. The autopsy for Juan Castro revealed three gunshot wounds. Dr. McMaster determined that the first gunshot wound was fatal because "it injured his heart and his right lung." She said no bullet was recovered because it perforated Juan Castro's body. Dr. McMaster recovered a bullet from the gunshot wound to his left back and shoulder. She explained, however, that the bullets recovered from his body were from "non-lethal wounds."

Tennessee Bureau of Investigation Agent Steve Scott testified as a ballistics expert. He tested the SKS semi-automatic rifle that was recovered in the instant case. He compared bullets he fired from the SKS semi-automatic rifle with the bullet recovered from Sara Garcia's leg. Agent Scott concluded that the bullet from Sara Garcia's leg had been fired through the barrel of the SKS semi-automatic rifle that was recovered near the gold car. Agent Scott also compared the bullet recovered from Patricia Garcia's brain to two bullets recovered from Juan Castro's right shoulder and left chest. Agent Scott determined that the bullets recovered from Patricia Garcia and Juan Castro were .38 caliber bullets and were not fired through the barrel of the SKS rifle. Agent Scott also examined a revolver that was found in another area of Maury County. Although Agent Scott determined that the bullets recovered from Patricia Garcia and Juan Castro were fired from the same gun, he was unable to match, include, or exclude the revolver from having fired the bullets.

Detective Korey Cooper with the Columbia Police Department responded to the shooting scene and photographed various items of evidence including a green bandana and a cigarette lighter. He also identified an orange pair of Nike tennis shoes. He said one shoe

was found in the road and the other was found in tall grass east of the scene. He further photographed the backseat of the gold car. It had a center compartment with a "fold down seat" which accessed the trunk of the car.

Detective Cooper also examined the victim's vehicle. It had a "black based paint job with orange glitter in it and [a] clear coat over that orange glitter." While at the scene, he found evidence of a "collision involving a black vehicle with orange glitter." He also found black scrapes on the passenger's side of the outside of the gold car. Detective Cooper measured the height of the tires or wheel base of the victim's vehicle and compared it to the damage on the gold car. He determined they were "within inches of a match." In addition, Detective Cooper found "gouge" or scrapes on the door frame of the gold car. There was orange glitter on the inside the gouge, which was collected and admitted as exhibit 44. He also collected paint chips of black base paint with orange glitter, admitted as exhibit 43, found inside the gold car on the front passenger side seat and on the floor board.

The jury was shown photographs of the area on the victim's truck from which samples of paint were taken, and photographs of black paint chips with orange glitter that were found on the front passenger seat of the gold car. Each of the samples were forwarded to the TBI. Detective Cooper explained the trajectory of the bullets to the jury through photographs of the victim's truck that had dowel rods in the bullet holes that entered the truck. Based on the crime scene, Detective Cooper opined that the gun fired at the victim's truck was from the driver's side. There was no indication that the gun was fired from or at the passenger side of the victim's truck. Detective Cooper observed at least eleven different bullet holes in the victim's truck.

On cross-examination, he acknowledged that the SKS rifle that was recovered would have ejected shell casings when fired and no shell casings were recovered from the scene or inside of the gold car. He additionally collected a cell phone, a yellow hat, sunglasses, a Newport cigarette box, a blanket, and three lighters from the scene. He was unaware if any of these items or the swabs he collected from inside of the gold car for the purpose of GSR testing had been processed. Although he processed the car for fingerprints, there were none of value found.

Melinda Raines, a criminalist from the Arizona Department of Public Safety Trace Analysis Unit, testified as an expert in hair examination and analysis. She compared eight hair samples from the orange shirt collected at the scene to a known hair sample from Sparkman. Two of the samples were not hair and five other samples were not suitable for comparison. She concluded that the remaining hairs appeared "microscopically similar to" the hair submitted from Sparkman; thus, Sparkman could not be excluded as the source of the hair. Based on her findings, she forwarded the samples for further mitochondrial DNA analysis.

Mark Smith, a forensic analyst from the Arizona Department of Public Safety, testified as an expert in the field of mitochondrial DNA. He received the samples of hair previously analyzed by Raines. He also received and analyzed buccal swabs from Robert Guerrero, Eric Guerrero, Charles Kelley, and Sparkman. He concluded that Sparkman could not be excluded as the source of hair in the samples from the orange shirt collected from the scene. Robert Guerrero, Eric Guerrero, and Charles Kelley were excluded as the source of hair from the orange shirt. On cross-examination, Smith acknowledged that he could not be 100% certain that the hair from the orange shirt came from Sparkman.

Agent Miranda Terry with the TBI microanalysis section testified as an expert in paint analysis. She examined the paint chips that were collected from this case and submitted to the TBI. Agent Terry concluded that "each of the paint samples from the subject's vehicle, Juan Castro's vehicle[,] and the paint samples from the crime scene were all consistent and could have come from the same source."

Mark Dunlap, a special agent forensic scientist with the TBI, testified as an expert in serology and DNA analysis. He analyzed the SKS rifle that was recovered from the scene. He obtained a DNA profile from the SKS rifle and compared it to buccal swabs or saliva samples from Eric Guerrero, Robert Guerrero, Charles Kelley, and Sparkman. He tested seven areas of the rifle and each indicated the presence of DNA. On the grip of the rifle, Agent Dunlap determined that Robert Guerrero was a major contributor to the DNA profile and that Sparkman could not be excluded as a minor contributor. He explained that when there is a mixture of DNA, the person with more DNA present than anyone else, is considered the major contributor. The probability of finding another person other than Robert Guerrero that would match the DNA profile on that evidence was less than one in six and a half billion. On the forearm of the rifle, Agent Dunlap found a full DNA profile that was consistent with a mixture of genetic material from at least three individuals. Sparkman and Robert Guerrero could not be excluded as minor contributors to the profile.

Agent Dunlap obtained a partial DNA profile on the trigger of the rifle. He found a mixture of genetic material from at least two individuals. However, insufficient DNA prohibited further interpretation of the profile. The bandana was tested and a mixture of genetic material from Eric Guerrero and Charles Kelley could not be excluded as contributors to that profile. Agent Dunlap also tested the orange shirt, obtained a DNA profile, and found a mixture of genetic material from at least two individuals, with Javoris Sparkman as the major contributor. The probability of an individual other than Sparkman having the same DNA profile from either the African-American, Caucasian, Southeastern Hispanic, or Southwestern Hispanic populations exceeds the current world population. Both shoes recovered in this case were also tested. Agent Dunlap collected biological material from the inside ankle area and obtained a DNA profile consistent with three individuals.

Sparkman could not be excluded as a contributor. On cross-examination Agent Dunlap acknowledged that DNA testing cannot determine when DNA was left behind.

The parties stipulated to the following: (1) examination of the rifle found near the gold car failed to reveal the presence of identifiable latent prints; (2) examination of the shoes and a Coke bottle from the gold car failed to reveal identifiable latent prints; and (3) there were no identifiable prints found on the second revolver located in a toilet tank.

Detective Jeremy Alsup of the Columbia Police Department testified that he was the case manager. He attended the autopsy of both victims and collected projectiles and personal effects. Based on the recovery of two different bullets during the autopsy, Det. Alsup determined that another weapon was involved in the shooting. He later conducted a grid search of the area east of the scene in an attempt to find the second firearm or other shell casings. During the grid search, an orange shirt was found in a thorn bush located between two and three hundred yards from the scene.

Detective Alsup also collected the recordings from the cameras in the officers' cars who responded to the Armory and the shooting scene. He prepared a single DVD of the relevant portions of the tapes and logged it as evidence. He determined the portions of the recordings that were compiled on the DVD to be of value because they showed

> officers arrive at the Armory and right in front of their cars, Eric Guerrero standing with Javoris Sparkman. It shows what they were wearing that night, very clearly shows Eric Guerrero in those clothes that [were previously admitted] and shows Javoris Sparkman in this orange outfit with the orange shoes that you see a short time later on Nashville Highway.

The tape, which also showed all of the victims walking to the truck, was played for the jury and admitted into evidence. In addition, the tape showed the area of the scene after the collision with Eric Guerrero and Robert Guerrero present wearing the same clothes they had on at the Armory twelve minutes earlier. On cross-examination, Detective Alsup opined that there were four occupants in the gold car. He believed that Robert Guerrero was driving the gold car with Sparkman in the front passenger seat, Charles Kelley seated directly behind Sparkman, and Eric Guerrero behind the driver.

Special Agent J. Russell Davis testified on behalf of Sparkman as an expert in GSR analysis. Unlike Agent Hodge, he analyzed "for the actual particles of gunshot residue on things other than hands." No gunshot primer residue was found on the orange shirt, the shoes from the site, shoe inserts, or the green bandana. Although Agent Davis was given a "swab" from the gold car, he did not test it because it was collected inappropriately for the testing method. None of the other items collected from the scene were submitted to him for

analysis. Sparkman was convicted of one count of first degree murder, two counts of first degree felony murder, and nine counts of attempted first degree murder. Following sentencing, he filed this timely appeal.

## ANALYSIS

**I. <u>Self-Defense Instruction</u>**. Sparkman contends the trial court erred in refusing to provide the jury with instructions regarding self-defense or defense of a third party. He argues that the glass at the scene of the collision, the damage to both cars, Sparkman's car "ending up in a ditch," a previous argument at the Armory, a co-defendant's statement regarding road rage, and Officer Humphrey's testimony that he thought the Guerrero brothers were victims of road rage, was sufficient evidence to support a self-defense instruction to the jury. In response, the State maintains the trial court properly instructed the jury because the evidence did not support either of the requested charges to the jury. We agree with the State.

A defendant has a '"constitutional right to a correct and complete charge of the law."' <u>State v. Litton</u>, 161 S.W.3d 447, 458 (Tenn. Crim. App. 2004) (quoting <u>State v. Teel</u>, 793 S.W.2d 236, 249 (Tenn. 1990) ( superseded by statute on other grounds as stated in <u>State v. Reid</u>, 91 S.W.3d 247, 291 (Tenn. 2002))). Accordingly, a trial court has the duty to "give a complete charge of the law applicable to the facts of the case." <u>State v. Davenport</u>, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (quoting <u>State v. Harbison</u>, 704 S.W.2d 314, 319 (Tenn. 1986); <u>see also</u> Tenn. R. Crim. P. 30(d)(2). This duty includes "giving jury instructions concerning fundamental issues to the defense and essential to a fair trial. . . ." <u>State v. Anderson</u>, 985 S.W.2d 9, 17 (Tenn. Crim. App.1997). <u>See</u> <u>also</u> <u>Myers v. State</u>, 185 Tenn. 264, 206 S.W.2d 30, 31-32 (Tenn. 1947) (holding that a defendant is entitled to an affirmative instruction on self-defense if raised by the evidence) and T.C.A. § 39-11-203(c).

In deciding whether a defense instruction is warranted, the trial court "must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." <u>State v. Sims</u>, 45 S.W.3d 1, 9 (Tenn. 2001). The defendant has the burden of introducing this evidence. T.C.A. § 39-11-203(c), Sentencing Commission Comments. If evidence has been presented which reasonable minds could accept as a defense, "the accused is entitled to the appropriate instructions." <u>Johnson v. State</u>, 531 S.W.2d 558, 559 (Tenn. 1975).

At the time of the offense, Tennessee Code Annotated section 39-11-611, defined self defense, in relevant part, as follows:

> (b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to

the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(d)(1), (2) (1997) (amended 2007).

Defense of a third person(s) was also defined as:

A person is justified in threatening or using force against another to protect a third person, if:

(1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and

(2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

T.C.A. § 39-11-612.

At the close of proof in this case, defense counsel requested the trial court to provide the jury with a self-defense or defense of third party instruction. He argued that it was reasonable for the jury to believe that the victim's truck was the first aggressor based on (1) the glass from the collision; (2) statements from a co-defendant that it was an incident of retaliatory road rage; (3) the inconclusive gunshot residue test on Juan Castro which could not exclude him as having been near, handled or fired a gun; and (4) that Officer Humphrey initially thought the incident involved road rage. In declining to charge self-defense, the trial court relied on the testimony of Jose Castro and Carlos Landauro. The trial court noted that

Castro said the gold car "turned off their lights and started shooting at [the victims] and banged into them," or "felt the vehicle bang into them." In addition, the trial court noted that Landuro said "We were going home, I saw sparks from my left side, I couldn't see the gold car, I ducked down, everything happened fast, we started swerving towards the car." In our view, there is no proof in the record to support either an instruction on self-defense or defense of a third person. Accordingly, the trial court properly instructed the jury and Sparkman is not entitled to relief.

**II. <u>Fair and Impartial Jury.</u>**[1] Sparkman argues that he was deprived of a fair and impartial jury. First, he claims the trial court erred in refusing to allow individual voir dire of prospective jurors and allowing the jury to hear "information that tainted the jury." Although Sparkman concedes the trial court conducted voir dire in groups of five and six persons, he maintains individual voir dire "would have been more appropriate." Secondly, Sparkman argues the trial court erred in refusing to exclude jurors with prior knowledge of the case. In response, the State contends the trial court acted within its discretion in conducting voir dire. We agree with the State.

"The ultimate goal of voir dire is to [ensure] that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court." <u>State v. Howell</u>, 868 S.W.2d 238, 247 (Tenn. 1993). "The prevailing practice is to examine jurors collectively." <u>State v. Austin</u>, 87 S.W.3d 447, 471 (Tenn. 2002); <u>State v. Oody</u>, 823 S.W.2d 554, 563 (Tenn. Crim. App. 1991); <u>State v. Hopper,</u> 695 S.W.2d 530, 539 (Tenn. Crim. App. 1985). However, "[i]ndividual voir dire is mandated only when there is a 'significant possibility' that a juror has been exposed to potentially prejudicial material." <u>Austin</u>, 87 S.W.3d at 471-72 (quoting <u>Howell</u>, 868 S.W.2d at 247). A trial court is granted wide discretion in ruling on the qualifications of the jurors, and a trial court's decision in this regard will not be overturned absent an abuse of discretion. <u>State v. Kilburn,</u> 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989). Moreover, "[a] trial court's finding of impartiality [may] be overturned only for manifest error." <u>Patton v. Yount</u>, 467 U.S. 1025, 1031, 104 S. Ct. 2885, 2889 (1984); <u>Howell</u>, 868 S.W.2d at 248.

The record does not reflect a pre-trial motion requesting individual voir dire. After excusing several jurors for hardship, the trial court stated

> Let me see a show of hands of any of you all that has read, heard or seen anything about this case. Okay. Quite a few.
>
> I am going to start with four. We have four chairs here. What I am going to do as soon as Ms. Kathy is ready here and she has to pull these names

---

[1]We have combined Sparkman's issues two and three for clarity.

out for me. I am going to call up four people. We are going to question those four people individually and then I am going to bring the rest of you up in groups of four or greater, depending on how this goes. In the meantime we ask for your patience and we are going to have an officer escort you all in just a minute to a different courtroom.

Prospective jurors who had read, seen, or heard anything about the case were instructed not to reveal any specifics. The trial court proceeded by allowing voir dire of small groups of prospective jurors. In each round of voir dire, when a prospective juror expressed prior knowledge of the case, the trial court permitted individual voir dire by the parties. Prospective jurors who had formed an opinion about the case that they were unable to set aside were excused.[2] We see nothing improper with the method of voir dire employed by the trial court. Although Sparkman insists that the entire jury venire was "tainted," we fail to see how. Sparkman has failed to demonstrate a manifest injustice and is not entitled to relief.

Sparkman argues the trial court erred in refusing to exclude jurors who had prior knowledge of the case. In Sparkman's brief, he combines this issue with his analysis of whether the trial court erred in denying individual voir dire. He fails to identify the jurors the trial court refused to exclude or provide any argument or analysis supporting this issue. As such, we have no way of determining which jurors he contends should have been excused for cause. Sparkman's failure to support his claim would ordinarily constitute a waiver of the issue. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). However, because the record clearly reflects the voir dire and those jurors who actually sat on the jury, we will review this issue on the merits.

Regardless of whether the trial judge should have excluded the challenged jurors for cause, any possible error is harmless unless the jury who actually heard the case was not fair and impartial. Howell, 868 S.W.2d at 248; State v. Thompson, 768 S.W.2d 239, 246 (Tenn. 1989). The failure to correctly excuse a juror for cause "is grounds for reversal only if the defendant exhausts all [of his] peremptory challenges, and an incompetent juror is forced upon him." Ross v. Oklahoma, 487 U.S. 81, 89, 108 S.Ct. 2273, 2279 (1988); State v. Jones, 789 S.W.2d 545, 549 (Tenn. 1990). As an initial matter, the record before this court fails to reveal the allocation of the peremptory challenges. During the small group voir dire, each

---

[2]The record does not reflect any contemporaneous objection to the method of voir dire employed by the trial court. Although Sparkman raised this issue in his motion for new trial, he stated nothing more than "what we have done is taken, I think, five at a time and questioning them, about five at a time." He failed to provide any further support on this issue.

challenge for cause exercised by Sparkman was granted by the trial court. In other words, none of the jurors who were actually empaneled in this case were challenged for cause. They were questioned extensively regarding their pre-trial exposure to the case. Five of the jurors knew nothing about the case. The remaining jurors had heard of the case through media outlets or other co-workers. None of these jurors recalled any details of the case. All of the jurors assured the court that they would be able to provide Sparkman with a fair and impartial trial. The record does not support a conclusion that an incompetent jury was forced upon Sparkman. He is not entitled to relief on this issue.

**IV. Change of Venue.** Sparkman argues the trial court erred in denying his motion for a change of venue. In response, the State contends that Sparkman is not entitled to relief because he has failed to demonstrate that the jurors who decided the case were biased or prejudiced. We agree with the State.

The decision to grant or deny a motion for a change of venue rests within the discretion of the trial court and will only be reversed by an appellate court upon a clear showing of an abuse of that discretion. State v. Rogers, 188 S.W.3d 593, 621 (Tenn. 2006) (appendix). A change of venue may be granted "when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a). When ascertaining whether a trial should be moved to another county, the court should consider the following factors:

1. The nature, extent, and timing of pretrial publicity;

2. The nature of the publicity as fair or inflammatory;
3. The particular content of the publicity;

4. The degree to which the publicity complained of has permeated the area from which the venire is drawn;

5. The degree to which the publicity circulated outside the area from which the venire is drawn;

6. The time elapsed from the release of the publicity until the trial;

7. The degree of care exercised in the selection of the jury;

8. The ease or difficulty in selecting the jury;

9. The venire person's familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire;

-14-

10. The defendant's utilization of his peremptory challenges;

11. The defendant's utilization of challenges for cause;

12. The participation by police or by prosecution in the release of the publicity;

13. The severity of the offense charged;

14. The absence or presence of threats, demonstrations or other hostility against the defendant;

15. The size of the area from which the venire is drawn;

16. Affidavits, hearsay or opinion testimony of witnesses; and

17. The nature of the verdict returned by the trial jury.

Rogers, 188 S.W.3d at 621-22 (appendix) (citing State v. Hoover, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979)).

In addition to these factors, the court must be mindful that "[t]he mere fact that jurors have been exposed to pretrial publicity will not warrant a change of venue." Id. at 621 (citing State v. Mann, 959 S.W.2d 503, 531-32 (Tenn. 1997)). Likewise, "prejudice will not be presumed on the mere showing of extensive pretrial publicity." Id. (citing State v. Stapleton, 638 S.W.2d 850, 856 (Tenn. Crim. App. 1982)). "The test is whether the jurors who actually sat on the panel and rendered the verdict and sentence were prejudiced by the pretrial publicity." Id. (citing State v. Crenshaw, 64 S.W.3d 374, 386 (Tenn. Crim. App. 2001); State v. Kyger, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989)).

In support of this issue, Sparkman broadly refers to the exposure of the proposed jurors to his case. He asserts he was "not able to receive a fair trial based upon all of the media, word of mouth, talk at work, and the various other forms of communication" in this case. He also notes that his co-defendant, Eric Guerrero, was tried and convicted in Maury County by a Wayne County jury. Consequently, he maintains the jury "viewed him as being guilty by association[.]" At the motion for new trial, the State argued that Sparkman's trial occurred over a year after the offense, three months had passed between Sparkman and his co-defendant's trial, and all publicity related concerns were addressed in voir dire. The trial court denied the motion without elaboration.

As previously stated, the jurors who actually sat on Sparkman's jury were questioned extensively and assured the trial court that they could provide a fair and impartial trial.

Sparkman fails to demonstrate how these jurors were prejudiced by the pre-trial publicity. The trial court properly denied the motion for a change of venue, and Sparkman is not entitled to relief.

**V. First Degree Murder Judgments.** We note the trial court entered separate judgments for the first degree premeditated murder of Juan Castro and for the felony murder of Juan Castro, counts one and two. When a defendant is convicted of both first degree premeditated murder and felony murder of the same person, the trial court should merge the convictions into a single judgment of conviction. See State v. Howard, 30 S.W.3d 271, 275 (Tenn. 2000); State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). The merger avoids a double jeopardy problem while protecting the jury's findings on both counts. When two judgments are entered, we should vacate them and order the trial court to enter one judgment of conviction reflecting the merger of the two convictions. See e.g., State v. Timmy Reagan, No. M2002-01472-CCA-R3-CD, 2004 WL 1114588 * 20, (Tenn. Crim. App. Sept. 17, 2003) (modifying and remanding case involving two judgments arising from a single first degree murder offense for entry of a single first degree murder judgment noting merger of the two convictions), app. denied (Tenn. May 19, 2004).

## CONCLUSION

Based on the foregoing reasoning and analysis, the judgments of the trial court for counts four through thirteen are affirmed. The judgments for counts one and two are vacated, and the case is remanded for entry of a single judgment of conviction for first degree murder that notes the merger of the convictions for counts one and two.

_____
CAMILLE R. McMULLEN, JUDGE

-16-